IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 2:10-CR-130-JAP |
| vs. | ) | |
| | ) | |
| **CARL EMANUEL HAESE**, | ) | |
| | ) | |
| Defendant. | ) | |


UNITED STATES' RESPONSE TO DEFENDANT'S
SENTENCING MEMORANDUM AND OBJECTION TO PRE-SENTENCE REPORT

The United States of America hereby responds to Defendant Carl Emanuel Haese's

Sentencing Memorandum and Objection to the Pre-sentence Report (Doc. 48), and respectfully

requests that the Court deny Defendant's objections and his request for a sentence of probation.  The

United States requests the Court to sentence Defendant to the high-end of the advisory guideline

imprisonment range — 33 months in prison, and sentence Defendant to pay full restitution to all of

the victims of his wire-fraud scheme in an amount not less than $159,110.53, plus pre-judgment

interest, as required by the Mandatory Victims Restitution Act (MVRA), and in any case under 18

U.S.C. § 3663.  *See infra* notes 7-8 (explaining why the $159,110.53 figure will almost certainly

increase when additional documentation and information is obtained from the victims).

In support of the factual assertions set forth herein, the United States intends to present

testimony from its case agent, Food and Drug Administration (FDA) Special Agent Todd Blair (SA

Blair) at the January 17, 2012 sentencing hearing.  The United States may also present the testimony

of one of its victims — Todd Stockton — who may testify regarding what expenses he incurred as

a result of Defendant's fraudulent scheme.  As detailed below, only Todd Stockton's requested

restitution is likely to require an evidentiary hearing to determine whether they are the direct result

of Defendant's fraudulent scheme, or Stockton's participation in the investigation or prosecution of

this case, and thus compensable under the MVRA.  *See* 18 U.S.C. § 3663A(b).

I.      Introduction

        On April 9, 2009, the FDA executed a search warrant at the Haese Clinic of Integrative

Medicine in Las Cruces, New Mexico (the clinic) because the owner — Defendant — was lying to

patients in order to get them to pay in excess of $5,000 each for a dubious Lyme disease treatment,

and ordering and intravenously treating the patients with compounded drugs without a medical

license.[1]  For instance, Defendant told prospective Lyme disease patients that he co-developed a

world-secret cure for Lyme disease, and treated over 3,000 patients with a 100% success rate.  (PSR

at 13, ¶ 42.)  Those statements were false.

        In stark contrast to what Defendant told prospective Lyme disease patients, Defendant

explained to SA Blair, during the execution of the search warrant, that since July 2008, eight patients

at the clinic had been treated for Lyme disease, that four of the patients had undergone what he

described as the "Bradford Protocol,"[2] and that the other four patients were treated with antibiotics.

(*Id.* at 8, ¶ 21.)  Defendant further explained that he did not personally treat the patients or write their

---

        [1]  Lyme disease is the most common arthropod-borne illness in the United States (more
than 150,000 cases have been reported to the Centers for Disease Control and Prevention since
1982).  However, in New Mexico, the disease is extremely rare.  In fact, according the New
Mexico State Department of Health, there have only been seven reported cases of Lyme disease
in Doña Ana County in the last 20 years and only five confirmed cases of Lyme disease in the
County during that same time period.

        [2]  As more fully set forth below, the "Bradford Protocol" was created by Robert Bradford,
Chula Vista, California who recently pled guilty to, *inter alia*, conspiracy to defraud Lyme
disease patients.

drug prescriptions because he knew that if he did, he would be practicing medicine without a license since he is not a licensed medical doctor. (*Id.* at 7-8, ¶ 19.)

As will be more fully described below, Defendant has diagnosed or confirmed previous diagnoses of Lyme disease using the "Bradford Microscope" and personally treated at least 32[3] patients for Lyme disease at the clinic since at least July 2008 using the "Bradford Protocol," prescribed drugs to each of them — without a medical license — and lied to his patients about the number of people he treated, his success rate treating Lyme disease patients, and his role in co-developing the protocol.

A.     Who is Carl Emanuel Haese?

Defendant is the 35-year-old son of Dr. Wolfgang Haese (Dr. Haese) (deceased).  Dr. Haese was a licensed medical doctor, who owned and operated the clinic prior to his death in 2008.  After his father's death, in July 2008, Defendant took it upon himself to run the clinic — albeit without a medical license and with just enough training and experience to make him dangerous.

In 1999, Defendant attended the Mesilla Valley School of Therapeutic Arts and received training in message therapy.  (*Id.* at 25, ¶ 77.)  In 2002, Defendant attended the Bradford Research Institute and received training in Blood Assessment and Microscopy.  (*Id.*)  In 2003, Defendant attended the Bradford Research Institute and received training in Peripheral Blood Assessment. (*Id.*)  In 2003, Defendant also attended a Professional Nutrition Specialist Program in Atlanta, Georgia.  (*Id.*)  In 2005, Defendant attended Pan American School of Natural Medicine, Nevis, West Indies and obtained the degree of Doctor of Naturopathy.  (*Id.*)  In 2005, Defendant also attended the

---

[3]  The PSR identifies 34 victims, however, Monet Pitre did not receive the treatment because she was too young.  (PSR at 15, ¶ 46.)  Additionally, Tommy Bickle was not diagnosed or treated for Lyme disease. (*Id.* at 14, ¶ 46.)

International Naturopathic College, Bejing, China[4] and obtained the degree of Doctor of Naturopathic Medicine.  (*Id.*)  Finally, in 2009, Defendant attended Ashwood University[5]  and obtained a Bachelor of Science in Nursing.  (*Id.*)   Based on this training, Defendant claims to practice naturopathic medicine which is an alternative form of medicine that focuses on treatment using such things as massage, diet, and sunshine.  Notably, naturopathic practitioners are not licensed medical practitioners in New Mexico.

Before Dr. Haese died, Defendant worked for his father at the clinic and practiced naturopathic medicine, while his father practiced traditional western medicine and some naturopathic and/or integrative medicine.  Dr. Haese also treated patients for Lyme disease using the "Bradford Protocol" which, presumably, Defendant became familiar with by virtue of working at the clinic and seeing his father meet with and treat patients.  When Dr. Haese died, Defendant kept the clinic alive by continuing to treat patients with naturopathic medicine and treating patients with Lyme disease, although without the medical knowhow to provide follow-up care, to include treating troublesome side effects.

---

[4]  The International Naturopathic College is a school that provides on-line naturopathic course work that allows a student to earn a medical degree within one year.  (*Id.* at 26, ¶ 78.)

[5]  Ashwood University is a school that awards degrees based on one's reported life/work experiences.  (*Id.* at 25, ¶ 77.)  The school does not require entry exams, purchase of books, or completion of any course work.  (*Id.*).  The school's "faculty" provides an assessment on reported life/work experiences and determines whether to bestow a bachelor's degree on the "student."  (*Id.*)   If so, the degree is mailed to the "student" within fifteen days.  (*Id.*)

B.     The "Bradford Microscope" and the "Bradford Protocol"

     1.     *The "Bradford Microscope"*

The "Bradford Microscope" takes its name from its inventor — Robert Bradford (Bradford),

Chula Vista, California.  The microscope is a high resolution microscope that has a digital camera

placed within the device and was purportedly designed to examine nutritional levels in the blood.[2]

Notably, Bradford is not a medical doctor and on September 17, 2010, he, *inter alios,* pled

guilty to Conspiracy to commit mail fraud, introduce misbranded drugs into interstate commerce,

receive misbranded drugs in interstate commerce, and defraud the FDA, in violation of 18 U.S.C.

§ 371. *United States v.  Robert W. Bradford*, No. CR 08-2168 KHV (D. Kan. 2010), Doc. 93.[3]

Bradford's Plea Agreement states, in pertinent part:

> [Bradford] is not a medical doctor, and has no medical or science degree from any
> accredited university in the United States.  [Bradford] is the Founder, Director of
> Research, and Scientific Director of CRB, Inc., d.b.a. American Biologics.
> [Bradford] is the Chief Executive Officer, Founder, and Director of Research at the
> Robert Bradford Research Institute ("The Institute"). The Institute claims it has
> researched and developed four proprietary compounds [including Dioxychlor and
> Sulfoxime].  Through The Institute, [Bradford] invented the Bradford Variable
> Projection Microscope ("Bradford Microscope") ostensibly used to identify
> pathologies and risk factors in health and disease.
>
> Beginning in . . . September 2001, [Bradford] [and others] developed a strategy for
> marketing drugs as a means to ostensibly treat Lyme disease, which [Bradford] [and
> others] claimed was the underlying cause of many illnesses the medical community
> was not addressing, and could not address.
>
> Beginning in . . . April 2004, [Bradford and others] wrote and distributed through
> The Institute, a report or monograph entitled "Lyme Disease, Potential Plague of the

---

    [2]  The "Bradford Microscope" was seized at the clinic during the execution of the search
warrant.

    [3]  Citations to "*Bradford*, Doc. __" are to documents filed in *United States v. Bradford*,
No. CR 08-2168 KHV (D. Kan. 2010).

Twenty-First Century -Detection Problems Resolved by imaging with the Bradford Variable Projection High Resolution Microscope."  In this monograph, [Bradford and others] stated, among other things, that: (1) "Lyme disease has the ability to mimic many other diseases," and is commonly "associated' with a number of diseases as well, including depression and Alzheimer's disease; (2) "it is estimated that Lyme disease may be a contributing factor in more than 50% of chronically ill people"; and (3) most patients diagnosed as suffering from Chronic Fatigue Syndrome actually have Lyme disease.

[Bradford and others] created and executed a marketing plan through which they promoted an epidemic of Lyme disease and created a demand for a microscope [Bradford and others] manufactured and claimed could diagnose the disease, and for drugs [Bradford and others]  manufactured and claimed could cure the disease.  The monograph made factual statements and cited sources as authority for those statements in order to convey credibility to the reader, when in truth and in fact those sources were false or misleading. The drugs that the defendants and others manufactured, marketed, and distributed had not been reviewed, cleared, or approved by the FDA for any reason, nor were they exempt from such review by FDA.

In conjunction with the Bradford Microscope and the Bradford Assessments, [Bradford and others] marketed a "protocol" of drugs, which they manufactured in a make-shift laboratory located in American Biologics' office in Chula Vista, California.  To manufacture these drugs, [Bradford and others], purchased several chemicals that were not certified or intended by their manufacturers for use in foods, drugs, or cosmetics for humans or animals.  [Bradford and others] received these chemicals in California in interstate commerce, and then manufactured various drugs with these chemicals by shipping these drugs through interstate commerce to a pharmacy in Colorado Springs, Colorado, where the pharmacy dissolved the drugs into aqueous solutions, based on "protocols" that were specific directions issued by [Bradford and others].

[Bradford] developed what he termed an "Antimicrobial Treatment" for diseases, including Lyme disease.  As part of the "Antimicrobial Treatment" [Bradford and others] manufactured Bismancine, Dioxychlor, BioRizin, and Sulfoxime.  This "Antimicrobial Treatment" involved the intravenous injection of these drugs.  Users purchased these drugs individually as well.  The monograph directed that users take varying doses of these drugs in interval stages, and combined the use of these drugs with other nutrients and vitamins.

Dioxychlor is the trademark of an intravenous drug invented by [Bradford], manufactured by [Bradford and others] at CRB, Inc.  It is further dissolved into an aqueous solution and marketed and distributed by [Bradford and others].  [Bradford and others] marketed and distributed Dioxychlor to treat a variety of medical conditions, including Lyme disease.

Sulfoxime is the trademark of an intravenous drug invented by [Bradford], manufactured by [Bradford and others] at CRB, Inc.  It is further dissolved into an aqueous solution and marketed and distributed by [Bradford and others].  [Bradford and others] marketed and distributed Sulfoxime to treat a variety of medical conditions, including Lyme disease.

During the course of and in furtherance of the conspiracy and scheme, [Bradford and others] manufactured and caused the manufacture of misbranded drugs, including Bismacine, Dioxychlor, Bio-Rizin, and Sulfoxime, and shipped and sold these misbranded drugs in interstate commerce; [Bradford and others] distributed or caused the distribution in interstate commerce, misbranded drugs, including Bismacine, Dioxychlor, Bio-Rizin, and Sulfoxime, some of which were intravenously injected into individuals seeking medical treatment; [Bradford and others] received or caused the receipt in interstate commerce, and thereafter delivered for payor otherwise, misbranded drugs, including Bismacine, Dioxychlor, Bio-Rizin, and Sulfoxime; the course of and in furtherance of the conspiracy and scheme, [Bradford and others] failed to register with the FDA in any capacity as producers, manufacturers, preparers, propagators, compounders, or processors of drugs, knowing they were required to do so; [Bradford and others] made material misrepresentations or omitted material facts to diagnose, or caused the diagnosis of, Lyme disease in individuals; [Bradford and others] made material misrepresentations or omitted material facts to promote the use of intravenous injections of Bismacine, Dioxychlor, Bio-Rizin, and Sulfoxime to treat disease, including Lyme disease; and [Bradford and others] intravenously injected or caused the intravenous injection of Bismacine, which resulted in one individual in Kansas experiencing renal failure, and another individual in Kansas lapsing into a coma and eventually died.

*Id.* at 3-5.

In 1999, Defendant and Dr. Haese met Bradford at a seminar and Bradford was promoting the "Bradford Microscope" as a means to examine nutritional levels in the blood.  (PSR at 8, ¶ 22.) Dr. Haese bought the microscope because he possessed degrees in hematology and pathology and was interested in studying blood.  (*Id.*)  Subsequently, both Dr. Haese and Defendant received training at the Bradford Institute regarding how to properly use the microscope.  (*Id.*)  Notably, the "Bradford Microscope" is neither designed nor approved for use in diagnosing persons with Lyme disease.  In fact, Defendant admits that the microscope does not have the ability to diagnose Lyme disease and claims that he does not use it for that purpose.  (*Id.*)  Notably, however, Defendant examined all of his Lyme disease patients' blood using the "Bradford Microscope" prior to

determining whether to prescribe them his dubious five, seven, or nine day treatment, and, in several instances, as more fully described below, Defendant used the "Bradford Microscope" to "diagnose" Lyme disease in patients who had not previously been diagnosed with the disease.

## 2.    *The "Bradford Protocol"*

The "Bradford Protocol" also takes its name from Bradford.  Defendant's version of the protocol consists of three separate IV solutions that are administered to patients over a period of five to nine days by a nurse at the clinic named Kim Loera (who also happens to be Defendant's girlfriend) or a licensed phlebotomist.  (*Id*. at 9, ¶ 24.)  According to Defendant, the first IV solution is "nutritional" and used to "bait" the Lyme disease parasite.  The second IV solution contains a drug called Dioxychlor used to "stun" the parasite, and the third IV solution contains a drug called Sulfoxime that kills the parasite.  (*Id.*)[4]

Defendant told his Lyme disease patients that he, his father, and Bradford co-developed the miracle protocol, but told SA Blair that all of his knowledge regarding the "Bradford Protocol" was obtained directly from Bradford at the Bradford Institute and that Defendant was not responsible for developing or co-developing the protocol.  Defendant advised SA Blair that he obtains Dioxychlor and Sulfoxime from College Pharmacy in Colorado Springs, Colorado — a prescription drug compounding and retail pharmacy that is a licensed manufacturer of proprietary drug compounds for licensed physicians throughout the United States.  *See* http://www.collegepharmacy.com (last visited Dec. 31, 2011).

---

[4]  Neither Dioxychlor nor Sulfoxime are listed or recognized by the FDA as safe and effective drugs and/or treatment for Lyme disease or any other disease.

C.      The Investigation into Defendant's Treatment of Lyme Disease Patients

In January 2009, two of Defendant's Lyme disease patients filed complaints with the New Mexico Board of Pharmacy regarding Defendant's Lyme disease treatment. The two patients — Carol Munson (Munson) and Todd Stockton (Stockton) — reported that Defendant: (1) confirmed their previous diagnosis of Lyme disease using the "Bradford Microscope" and treated their Lyme disease with intravenous prescription drugs; (2) stated that he and his father, and "Dr. Robert Bradford" invented the intravenous treatment; (3) reported having treated and cured 3,000 patients with this method with a 100% success rate; and (4) used an intravenous cocktail containing Dioxychlor and Sulfoxime obtained from College Pharmacy in Colorado. Based on these representations, both patients agreed to let Defendant treat them. Both patients paid Defendant over $5,000 for their treatment

Munson reported that she paid $5,100 for Defendant's purported seven-day Lyme disease treatment and that Defendant's post-treatment care consisted of telling her to wait two months to see if her symptoms went away. (*Id.* at 6, ¶ 14.)  After two months, Munson became more sick and her husband, Dan Munson (Mr. Munson), placed numerous telephone calls to Defendant to discuss his wife's medical condition, but Defendant never returned the calls. (*Id.* at 6, ¶ 15.)  Mr. Munson became suspicious and contacted Bradford who reported no affiliation with Defendant and explained that the Dioxychlor and Sulfoxime cocktail was his protocol to treat blood fungus and mold, not Lyme disease. (*Id.* at 6-7, ¶ 15.)  As stated above, however, Bradford was also engaged in a scheme to defraud Lyme disease patients using a protocol similar to the one used by Defendant.

Stockton advised that he also paid Defendant over $5,000 for his failed Lyme disease treatment and began urinating blood several hours after his first intravenous treatment. (PSR at 5, ¶ 12.) The next day, Stockton reported the bleeding to Defendant, and questioned Defendant about

his medical degrees and training, to which Defendant stated that his medical degrees and training were confidential. (*Id.* at 5, ¶ 10.) Defendant then gave Stockton a business card that identified himself as "Sir Carl E. Haese, NMD, ND, DNM, OSJ Knight of Honor, Integrative and Orthomolecular Medicine," and said that his medical credentials were immune from all state and federal government medical licensing in regards to his practice and treatments. (*Id.*) When Stockton questioned Defendant further, he became irate and told Stockton that he was not suited for the treatment and refused to refund Stockton his money. (*Id.* at 5, ¶ 12.) The State then contacted the FDA.

On January 29, 2009, SA Blair, acting in an undercover capacity, contacted Defendant by telephone to try and determine whether Defendant was diagnosing and treating patients for Lyme disease in the manner described by Munson and Stockton. During the recorded conversation, Defendant told SA Blair that he owns the clinic, that he had treated over 3,000 patients for Lyme disease in the last five years, and that all of his patients had reported sufficient benefits from his treatment. Notably, Defendant's representations to SA Blair regarding the number of Lyme disease patients Defendant treated and his success rate were substantially similar to the false representations Defendant made to Munson and Stockton.

Defendant advised SA Blair that he is a naturopathic doctor licensed in Ecuador, the Caribbean, and Asia. Defendant stated he obtained a medical degree in China and a second degree from the Pan American School of Naturopathic Medicine. Defendant also stated he is not a board certified naturopathic doctor in New Mexico and that the United States does not recognize any of his medical degrees because they are not accredited schools or universities recognized by the United States or the American Medical Association (AMA).

Defendant further stated that he is a former Lyme disease patient and that his illness was the reason he and his father began searching for a treatment for the disease.  Defendant also advised he and his father co-developed the Lyme disease treatment protocol with Dr. Robert Bradford and Dr. Henry Allen of the Bradford Institute and American Biologics located in Chula Vista, California. Notably, this representation is also false and substantially similar to the representations Defendant made to all of his prospective Lyme disease patients.  As stated above, Defendant later admitted to SA Blair during the execution of the search warrant that he neither developed nor co-developed the so-called "Bradford Protocol."

Defendant further indicated to SA Blair that the clinic "specialty of the house" was Lyme disease diagnosis and treatment.  Defendant advised he treated Lyme disease with "antimicrobial kit" infusions, containing Dioxychlor and Sulfoxime manufactured by College Pharmacy, and that his treatments lasted five, seven, or nine days, depending on the patient.  When SA Blair told Defendant that he had Lyme disease and how long he had it, Defendant told him that he would prescribe a seven day treatment that would cost $5,410.  When SA Blair asked Defendant about his success rate treating Lyme disease, Defendant stated that fewer than 100 patients out of 3,000 had returned for a second round of treatment, and that approximately seven people had returned for a third treatment.

Defendant told SA Blair that he personally diagnosed patients with Lyme disease by conducting a "live blood analysis" using the Bradford Variable Projection High Resolution Microscope.  Defendant represented that this analysis would indicate whether a patient presented with Lyme disease, or other parasitic activity and that the "Bradford Microscope" could also identify the condition of a patient's immune system, as well as their nutritional levels.  Defendant also

advised that, if his diagnosis confirmed that SA Blair had Lyme disease, he would personally prescribe the treatment for him.

On approximately February 1, 2009, Defendant called SA Blair and left a voice message asking that he return his call.  On February 9, 2009, SA Blair contacted Defendant by telephone. During the recorded conversation, Defendant, suspicious about all the pointed questions SA Blair asked him, wanted SA Blair to identify the person who referred him and then told SA Blair that he would no longer be available to treat him because he felt uncomfortable about the way SA Blair "interrogated him."

On March 11, 2009, SA Blair contacted College Pharmacy and learned that Defendant had ordered "antimicrobial kits," which contain Dioxychlor and Sulfoxime, through prescriptions purportedly  written by Richard Simmons, M.D., an ophthalmologist in Las Cruces, New Mexico (Dr. Simmons), and Dr. Bradford Haire, D.O., an emergency medicine physician at the Gila Regional Medical Center in Silver City, New Mexico (Dr. Haire).  Both of these doctors worked at the clinic for a short time after Dr. Haese passed away, and upon information and belief, neither of these doctors were part of Defendant's scheme to defraud Lyme disease patients.

Dr. Simmons is a pediatric ophthalmologist and he was a personal friend of Dr. Haese.  (PSR at 8,  ¶ 20.)   In July 2008, Dr. Haese's wife contacted him and advised him that Dr. Haese passed away and told him that the clinic needed a licensed medical doctor on staff to stay open. (*Id.* at 11, ¶ 35.) Because Dr. Simmons owned his own practice, he was unable to work at the clinic full-time, however, he did agree to work there for four or five days in August 2008.  (*Id.*)  During his employment at the clinic, Dr. Simmons did not treat any patients because none of the clinic's patients sought treatment in Dr. Simmons' area of expertise.  (*Id.* at 11, ¶ 36.)  More specifically, Dr. Simmons did not diagnose or treat anybody for Lyme disease.  Notably, however, Dr. Simmons

did meet a female patient at the clinic who advised him that she was being treated for Lyme disease by Defendant using an intravenous treatment.  (*Id.*)

Notwithstanding the fact that Dr. Simmons did not diagnose or treat any patients at the clinic for any disease, much less Lyme disease, Defendant ordered  Dioxychlor and Sulfoxime (the two drugs used in the "Bradford Protocol" under Dr. Simmons' name and medical license through December 2008 — four months after Dr. Simmons left the clinic, and, as more fully described below, four months *after* Dr. Haire started working at the clinic.  Specifically, from July 31, 2008 to December 19, 2008, Defendant ordered at least 46 quantities of Sulfoxime and 30 quantities of Dioxychlor under Dr. Simmons' name and medical license. Dr. Simmons was unaware that Defendant was using his name and medical license to order the drugs.   (*Id.* at 12, ¶ 37.)  Dr. Simmons assumed that Defendant was using Dr. Haire as its prescribing physician for all patient prescriptions and prescription orders.

Dr. Haire is an emergency room physician at the Gila Regional Medical Center.  (*Id.* at 10, ¶ 29.)   He worked at the clinic from August 2008 to July 2009.  Prior to his employment at the clinic, he did not know Dr. Haese or Defendant, but met Defendant through a patient who explained that Defendant practiced naturopathy and needed to hire a licensed medical doctor for his clinic. Having an interest in naturopathy, Dr. Haire agreed to work at the clinic two days a week.  For the eleven months he worked there, Dr. Haire was the clinic's sole licensed physician and medical director.  Dr. Haire diagnosed and treated patients at the clinic using standard western medicine and holistic practices, which included vitamin intravenous therapies for various mental and disease states, including heart disease, high blood pressure, Fibromyalgia, mental disorders, and multiple sclerosis.  Dr. Haire advised SA Blair that he never diagnosed or treated patients for Lyme disease

at the clinic. (*Id.* at 10, ¶ 32).  In fact, Dr. Haire claims that he did not know that Defendant was

diagnosing or treating patients for Lyme disease.[5]

Dr. Haire further explained that while he worked at the clinic, he authorized Defendant to

order pharmaceutical drugs from pharmaceutical companies — including College Pharmacy, but that

the ordered drugs were supposed to be for chelation therapies and for Myers Cocktails. (*Id.* at 10,

¶ 31.) Furthermore, Dr. Haire advised that he was unaware that Defendant was ordering Dioxychlor,

Sulfoxime, and "antimicrobial kits" and never saw the drugs at the clinic and was unfamiliar with

them.

II.   <u>Procedural History</u>

On January 15, 2010, Defendant pled guilty pursuant to a Plea Agreement to an Information

charging a single count of Wire Fraud, in violation of 18 U.S.C. § 1343.  (Doc. 26.)  The factual

basis underlying the charge of conviction provided:

> On or about October 15, 2008, Todd Stockton contacted me regarding treatment for
> Lyme disease.  I told Mr. Stockton that I had a treatment protocol for Lyme disease
> and that I had a 100% success rate for everybody that I treated.  My representation
> that I had a 100% success rate for everybody that I treated was false.  I fact, my
> treatments have produced varying results.  Mr. Stockton paid in excess of $5,000.00
> for his Lyme disease treatment with a Chase Visa credit card.  The credit card
> transaction initiated at the Haese Clinic in Las Cruces, New Mexico and was
> processed by BBNT Bank in North Carolina.

(PSR at 4, ¶ 7.)  Pursuant to the terms of the Plea Agreement, the parties stipulated that two

Guideline enhancements apply:  (1) USSG § 2B1.1(b)(1)(E)'s eight-level enhancement for the

amount of loss,[6] and (2) USSG § 2B1.1(b)(2)(A)'s two-level enhancement for Defendant's scheme

---

[5]  Notably, at least one former Lyme disease patient at the clinic claims that Dr. Haire
consulted with her about Lyme disease.

[6]  The parties stipulated that the aggregate loss suffered by the victims in this case was
more than $70,000, but less than $120,000, based on information known at the time, however,
the actual aggregate loss sustained by the victims is greater than $120,000.

involving more than 10 victims.  (PSR at 4-5, ¶¶ 9 (c)-(d).)  Additionally, the parties agreed that

Defendant would pay a $10,000 fine.  (*Id*. at 5, ¶ 9(e).)  Regarding restitution, the Plea Agreement

also provided:

> Notwithstanding the defendant's guilty plea to one discrete count of Wire Fraud
> involving one victim, the defendant agrees to pay full restitution to all victims of his
> wire fraud scheme in an amount to be determined as sentencing.

(*Id*., ¶ 9(f).).  *See United States v. Gregoire*, 638 F.3d 962, 972-73 (8th Cir. 2011) ("Restitution may

be ordered for criminal conduct that is part of a broad scheme to defraud, without regard to whether

the defendant is convicted for each fraudulent act in the scheme.").

The PSR identified 33 victims of Defendant's fraudulent scheme.  (PSR at 14-17, ¶ 46.)

Additionally, the PSR calculated each victim's loss separately, and determined that their combined

loss totaled $187,419.90.  (*Id*. at 14, ¶ 46.)  On November 2, 2011, Defendant filed a Sentencing

Memorandum and Objection to the Pre-Sentence Report, arguing for a sentence of probation and

objecting to having to pay full restitution to numerous victims, as more fully addressed below.  (Doc.

48.)  Sentencing is set for January 17, 2012 in Las Cruces, New Mexico.

III.   Argument

As explained herein, Defendant's correctly calculated guideline range is 27-33 months, and

that range is far lower than the 10-year statutory maximum.  *See* 18 U.S.C. § 1343.  A high-end 33-

month guideline sentence is sufficient, but not greater than necessary, to reflect Defendant's history

and characteristics, the seriousness of his offense, impose just punishment, and deter Defendant and

others from white collar crime.  *See* 18 U.S.C. § 3553(a).  This Court should deny Defendant's

request for a downward variance.  With regard to restitution, the United States respectfully requests

that the Court order Defendant to pay not less than $159,110.53, plus pre-judgment interest, in

restitution as outlined below.  *See also infra* notes 7-8 (explaining why the $159,110.53 figure will

almost certainly increase when additional documentation and information is obtained from the victims).

A.    Defendant's Correctly Calculated Guideline Range Is 27-33 Months in Prison.

At the outset, the United States responds to Defendant's PSR objections, and maintains that the PSR properly applied USSG § 3A1.1(b)(1)'s two-level enhancement for Defendant's victims being "vulnerable victims" (*see* PSR at 20, ¶ 52), and USSG § 3B1.3's two-level enhancement for Defendant's abuse of his position of trust.  (*Id.* at 19, ¶ 53.)  Defendant also objects to the PSR's application of USSG § 3C1.1's two-level enhancement for obstruction.  (PSR at 20, ¶ 54.)  The United States is not pursuing that enhancement.  As such, Defendant's correctly calculated offense level is 18, and therefore his guideline range is 27-33 months in prison.

1.    *USSG § 3A1.1(b)(1)'s "Vulnerable Victim" Enhancement Applies.*

Defendant contends that the PSR erroneously applied USSG § 3A1.1(b)(1)'s enhancement because the PSR did not individually assess why each of his victims were vulnerable and a "general descriptor of vulnerable class is not enough" to trigger the enhancement.  (Doc. 48 at 14-17.)  He further contends that he did not target vulnerable victims because he did not advertise and most of his patients came to the clinic via patient referrals.  (*Id.*)  Defendant is wrong.

The Tenth Circuit recently explained who constitutes a "vulnerable victim" under USSG § 3A1.1(b)(1) this way:

> A vulnerable victim is a person "who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." USSG § 3A1.1 cmt. n.2.  The status of "vulnerable victim" hinges on the idea that some characteristic renders as victim 'particularly susceptible' to the criminal conduct.  In other words, the "vulnerable victim" is someone who is unable to protect himself or herself from criminal conduct, and is therefore in need of greater societal protection than the average citizen.  In assessing vulnerability, the sentencing court must make an individualized determination; it is not enough that the victim belongs to a class generally considered vulnerable.

*United States v. Talk*, Nos. 10-2123, 10-2130, 2011 WL 615337, at *9 (10th Cir. Dec. 12, 2011)
(unpublished) (additional citations omitted).  Further, the vulnerable-victim enhancement applies
if Defendant "*should have known* that a victim of the offense was unusually vulnerable or otherwise
particularly susceptible to the criminal conduct." *Id*. at *11 (internal quotation marks and citations
omitted).  The Tenth Circuit has also recognized that determining whether the vulnerable-victim
enhancement applies requires this Court to "look to all relevant conduct and not just the offense of
conviction." *United States v. Fillman*, 325 F. App'x 700, 708 (10th Cir. 2009) (unpublished)
(internal quotation marks and citations omitted).  Further, "the enhancement should apply when the
victim is less able to resist [the Defendant's criminal conduct] than the typical victim and requires
greater societal protection." *United States v. Scott*, 529 F.3d 1290, 1300 (10th Cir. 2008).

　　　　Here, as detailed below in discussing the restitution Defendant owes each victim,  many of
Defendant's victims had been diagnosed with Lyme disease, had exhausted traditional treatment
options for the debilitating disease without success, and advised Defendant of as much when they
sought his treatment.  As such, Defendant's victims were unusually vulnerable and particularly
susceptible to Defendant's false representations regarding his Lyme disease treatment. *See generally*
http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0002296/ (United States National Library of
Medicine's web page regarding Lyme disease, including complication attendant to the most
advanced state of the disease) (last visited Dec. 31, 2011).  Defendant's victims' understandable
desire to be cured of Lyme disease made them willing to pull out their credit cards pay Defendant's
$5,000 asking price without asking the sorts of probing questions SA Blair asked during the
undercover recorded conversations.  Put simply, Defendant's victims were vulnerable in a way and
to a degree not typical of the general population of Lyme disease patients, much less the general
population of patients seeking naturopathic treatment, and  Defendant exploited that vulnerability

in undertaking his fraudulent, fear-mongering scheme. *See, e.g.*, *United States v. Moon*, 513 F.3d 527, 540-41 (6th Cir. 2008) (holding that chemotherapy patients were within the class of "vulnerable victims" under USSG § 3A1.1(b)(1), when the fraud being perpetrated involved the presentation of an ineffective treatment for cancer); *compare United State v. Chee*, 514 F.3d 1106, 1117 (10th Cir. 2008) (vulnerable victim enhancement applicable to where defendant's aggravated sexual abuse victimized a disabled 28-year-old woman suffering from seizures and partial paralysis, as well as moderate mental retardation that caused her to have mental capacity of five-year-old); *United States v. Lee*, 973 F.2d 832, 834 (10th Cir. 1992) (vulnerable victim enhancement inapplicable where the district court failed to make "particularized findings of vulnerability" and applied the enhancement "based solely on the victims' membership in the class of 'elderly' persons"); *United States v. Creech*, 913 F.2d 780, 781-82 (10th Cir. 1990) (newlyweds as a class are not vulnerable victims). The PSR correctly enhanced Defendant's sentence two levels under USSG § 3A1.1(b)(1).

2.   <em>USSG § 3B1.3's Abuse of Trust Enhancement Applies</em>.

Defendant also argues that the PSR erroneously applied USSG § 3B1.3's enhancement because he "did not provide indicia to his patients that he held a skill which he did not hold." (Doc. 48 at 13-14.) Defendant misapprehends USSG § 3B1.3. As the Tenth Circuit has explained:

> Section 3B1.3 states that "if the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, increase by 2 levels." To invoke § 3B1.3, the defendant must either occupy a formal position of trust or must create sufficient indicia that he occupies such a position of trust that he should be held accountable as if he did occupy such a position. The primary concern of § 3B1.3 is to penalize defendants who take advantage of a position that provides them freedom to commit or conceal a difficult-to-detect wrong. The question of whether an individual occupied a position of trust is evaluated from the victim's perspective.

*Chee*, 514 F.3d at 1117-18 (quoting USSG § 3B1.3) (additional internal quotation marks, brackets, and citations omitted). In other words, the United States "must satisfy two elements to meet

§ 3B1.3, establishing:  (1) whether the person occupies a position of trust, and (2) whether the position of trust was used to facilitate significantly the commission or concealment of the crime." *United States v. Spear*, 491 F.3d 1150, 1153-54 (10th Cir. 2007).  Both elements are met here.  As noted above, Defendant held himself out to his patients and prospective patients as a naturopath, licensed in Ecuador, the Carribean, and Asia, who owned the clinic, and who had treated over 3,000 patients for Lyme disease.  He also held himself out to have co-developed the Bradford Protocol, along with his father and Bradford.  Indeed, on at least one occasion, Defendant claimed to be no less than "Sir Carl E. Haese, NMD, ND, DNM, OSJ Knight of Honor, Integrative and Orthomolecular Medicine."  (PSR at 5, ¶ 10.)  Defendant, in turn, used his position of trust — as a naturopath and owner of the clinic — and claimed special skill to facilitate his fraud: claiming, *inter alia*, that all of the 3,000 patients that he had treated for Lyme disease had reported sufficient benefits from his treatment.  In other words, contrary to Defendant's position, USSG § 3B1.3's enhancement applies because he held a position of trust and he took advantage of that trusted position to commit or conceal his fraudulent scheme.  *See, e.g.*, *Chee*, 514 F.3d at 1117-18 & n.6 (abuse of trust enhancement applicable where the defendant was a medicine man who used his "'professional discretion' to facilitate and conceal his offense" even though he was not purporting to perform a medicine man ceremony when he sexually assaulted his victim).  The PSR correctly enhanced Defendant's sentence two levels under USSG § 3B1.3.  Therefore, as noted above, Defendant's correctly calculated offense level is 18, and therefore his guideline range is 27-33 months in prison.  (*But see* PSR at 57, Part D (calculating Defendant's offense level to be 20, based on the plea agreement stipulations, the USSG § 3A1.1(b)(1) and USSG § 3B1.3 enhancements, and USSG § 3C1.1's two-level enhancement, which the United States does not ask the Court to apply).)

B.   <u>No Downward Variance Is Warranted, and a 33-month Term of Incarceration Is Sufficient, But Not Greater than Necessary to Achieve 18 U.S.C. § 3553(a)'s Sentencing Aims</u>.

A 33-month guideline sentence is authorized by statute, 18 U.S.C. § 1343 (maximum penalty 20-years incarceration), and the facts and circumstances of this case make evident that nothing less than a high-end sentence of 33-months incarceration is sufficient to meet 18 U.S.C. § 3553(a)'s sentencing aims.  Defendant's motion for a downward variance to probation should be denied.

The grounds Defendant relies on in seeking a downward variance are, at best, wholly unpersuasive, and, at worst, offensive.   Specifically, in arguing that probation reflects the seriousness of his offense, and that any term of imprisonment is "greater punishment than necessary," Defendant contends:  (1) he had no "big plan to defraud," and that "every one of the Lyme patients came to the Clinic on their own," and he provided a "valuable service to all most all of them with only a few complaints"; (2) his prior criminal history is comprised of only traffic tickets; (3) a sentence of imprisonment serves no purpose; and (4) he has already suffered sufficiently from his crime because the stress of this prosecution and because he is a convicted felon. (Doc. 48 at 23-24.)

1.   *Nature and Circumstances of the Offense, the Seriousness of the Crime, and Defendant's History and Characteristics*

A 33-month sentence is necessary to account for the nature and circumstances of Defendant's offense and the need for the sentence to reflect the seriousness of the crime.   18 U.S.C. §§ 3553(a)(1), (a)(2)(A).  This is not a case where Defendant had an isolated, one-time lapse in judgment.  Over the course of two years, Defendant made the decision to steal, at least, thirty-two times, and did so.  Defendant's conduct also was an egregious abuse of trust.  His victims put their faith in Defendant to cure them of Lyme disease, a disease that afflicted them and which, to their

knowledge, had no cure.   The victims put their trust in Defendant based on his fraudulent representations.

Defendant's reliance on his lack of criminal history should carry no weight with the Court. The 27-33 month guideline range already accounts for this factor.   PSR ¶ 67 (Criminal History Category I).   In any event, a probationary sentence would be entirely inappropriate here, given that Defendant – even after pleading guilty to this federal felony in January 2010 – apparently still has not recognized the seriousness of his dishonest, calculating, and prolonged crime.   By continually trying to explain away and minimize his conduct, Defendant has made clear that he still has not gotten the message.   For example, in his Sentencing Memorandum, Defendant argues that only Todd Stockton is a victim and that it is not his fault that patients referred each other to the clinic.   (Doc. 48 at 23.)

Relatedly, Defendant's contention that incarceration is unnecessary because he has already suffered sufficiently evidences why incarceration is necessary.   Defendant's present circumstances are the direct result of his actions, his choices, his conduct.   His contentions to the contrary show that he does not fully appreciate the severity of his criminal conduct, his crime, and demonstrate that his history and characteristics require significant jail time.   For instance, Defendant's suggestion that the significant downward variance he seeks is warranted, because he is a convicted felon and sold the clinic he used to perpetuate his fraud are simply consequences of his crime.   18 U.S.C. § 3553(a)(1)-(2); *see generally United States v.Ruff*, 535 F.3d 999, 1006-07 (9th Cir. 2008) (Gould, J., dissenting) (recognizing that lax sentences for white collar crime "will likely be considered offensively unreasonable to the vast majority of law abiding citizens").

Similarly baffling is Defendant's suggestion that his personal situation, which are largely due to the strain this prosecution caused, show that he has paid sufficiently already for his crime.

Defendant's willingness to cast aspersions regarding his personal situation, rather than looking in the mirror, is telling. *Id.* (Sanchez "continues to try to sabotage [Defendant's] life"). Put simply, the economic and personal straights in which Defendant now finds himself are a direct product of his calculating and prolonged criminal conduct. These collateral consequences – obvious and foreseeable – are certainly not adequate punishment for Defendant's crime, nor are they reason to vary from the guideline range. Defendant should have to bear the full costs – collateral and penal – of his crime. A 33-month term of incarceration is appropriate given the nature of this crime, its severity, and Defendant's history and characteristics. See 18 U.S.C. §§ 3553(a)(1), (a)(2)(A).

        2.     *Need to Promote Respect for the Law, Provide Just Punishment, Deter Defendant and Others from Future Crimes, and Avoid Unwarranted Sentencing Disparities*

A 33-month high-end guideline sentence is also necessary to promote respect for the law, provide just punishment, and deter Defendant and others from future crimes. The need for sentencing uniformity is simple: federal defendants who face the same charges, whether they are being sentenced in New York City, Omaha, Nebraska, or Las Cruces, New Mexico, should receive like sentences. Indeed, "[t]he goal of the Sentencing Guidelines is, of course, to reduce unjustified disparities and so reach toward the evenhandedness and neutrality that are the distinguishing marks of any principled system of justice." *Koon v. United States*, 518 U.S. 81, 113 (1996). "The federal courts have been striving towards this worthy goal since 1987" and "this goal remains the same post-*Booker*." *United States v. Gonzalez-Huerta*, 403 F.3d 727, 738 (10th Cir. 2005).

In enacting 18 U.S.C. § 3553, "Congress viewed deterrence as particularly important in the area of white collar crime":

    Congress was especially concerned that prior to the Sentencing Guidelines, "[m]ajor white collar criminals often [were] sentenced to small fines and little or no

imprisonment. Unfortunately, this creates the impression that certain offenses are punishable only by a small fine that can be written off as a cost of doing business."

*United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (quoting S. Rep. No. 98–225, at 76 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3259) (vacating a seven-day sentence where the guidelines range was 108-135 months imprisonment and defendant's crime caused one billion dollars in loss to thousands of victims).  Indeed, "[o]ne of the central reasons for creating the sentencing guidelines was to ensure stiffer penalties for white-collar crimes and to eliminate disparities between white-collar sentences and sentences for other crimes." *United States v. Davis*, 537 F.3d 611, 617 (6th Cir. 2008) (citations omitted) (vacating a one-day sentence where the guideline range was 30-37 months imprisonment and defendant's crime caused over $900,000 in loss); *United States v. Omole*, 523 F.3d 691, 698-700 (7th Cir. 2008) (vacating a 12-month sentence where the guideline range was 63-78 months imprisonment, defendant's fraud caused $90,000 in losses, defendant was young (20 years old), and had no prior serious criminal history).

The probationary sentence that Defendant seeks would be a slap on the wrist compared to typical defendants convicted of mail fraud, as evidenced by the 27-33 month guideline range. Indeed, as the Sixth Circuit has recognized, there are unique problems attendant to imposing lax sentences in white-collar cases:

> Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidate[s] for general deterrence.  Defendants in white collar crimes often calculate the financial gain and risk of loss, and white collar crime therefore can be affected and reduced with serious punishment . . . [T]he message of [lax sentence including only a short term of incarceration] . . . is that would-be white-collar criminals stand to lose little more than a portion of their ill-gotten gains and practically none of their liberty.

*Martin*, 455 F.3d 1227, 1250 (11th Cir. 2006) (citations omitted); *see generally Ruff*, 535 F.3d at 1006-07 (Gould, J., dissenting) ("To provide for a mere slap on the wrist of those convicted of

serious economic crimes, with no or virtually no time imprisoned as punishment, strikes a blow to the integrity of our criminal justice system.  In the end, if not corrected, the majority's approach will be dangerous to respect for our legal system.  Can it be seriously maintained that wilful offenders who commit white collar crime, who steal intentionally hundreds of thousands or even millions of dollars, should receive no forced incarceration, while those poor and powerless criminal defendants who commit common larceny or theft often serve extensive hard time? . . . . Members of the public with respect for the law . . . will doubtless consider it almost inconceivable that a man who steals more than a half-million dollars in a calculated and prolonged course of deception and embezzlement over several years will suffer only a single day in prison."); *see also* Stephen Breyer, *The Federal Sentencing Guidelines and the Key Compromises upon Which They Rest*, 17 Hofstra L. Rev. 1, 20-22 (1988).

Sentencing Defendant below the guideline range, let alone to probation, would thwart Congress' intent in fashioning the guideline ranges for white collar crime.  Defendant deserves a sentence that is closer to the typical sentence received by the typical white-collar defendant with Defendant's criminal history, which the United States believes is 33 months in this case.  *See, e.g., United States v. Bryant,* 606 F.3d 912 at 921-22 (affirming sentence of 18-months incarceration as substantively reasonable where defendant was convicted of mail fraud, the amount of loss totaled $29,444, the victim was a large insurance company, and defendant had a prior drug conviction); *see generally Gall v. United States*; 552 U.S. 38, 54 (2007) (recognizing that "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges").  To promote respect for the law, provide just punishment, deter defendant and others from future crimes, and avoid unwarranted sentencing disparities, especially given Defendant's history,

characteristics, and the seriousness of this crime of dishonesty, this Court should sentence Defendant to 33-months incarceration.  *See* 18 U.S.C. §§ 3553(a)(1), (a)(2)(A)-(B).

      C.     <u>Defendant Must Be Ordered to Pay Not Less Than $159,110.53 in Restitution.</u>

As previously noted, the United States respectfully requests that the Court order Defendant to pay not less than $159,110.53, plus pre-judgment interest, in restitution to his victims pursuant to the MVRA, and in any case under 18 U.S.C. § 3663.  *See infra* notes 7-8.  In this section, the United States discusses the MVRA, the statute governing restitution in this case, and then turns to the restitution that Defendant owes each victim individually.  Defendant objects to the amount of restitution the PSR identifies and to certain patients being designated as "victims" for purposes of restitution, but he does not object to paying at least partial restitution to some of the victims, obviating the need for further fact finding by the Court with regard to the amount and type of restitution Defendant agrees to pay.  *See United States v. Barton*, 366 F.3d 1160, 1166 (10th Cir. 2004) ("Where . . . the PSR recommends restitution under the MVRA for an actual recoverable loss incurred by a victim of the defendant's crime, and the defendant does not object to that request, there is no need under the MVRA for a district court to engage in any additional fact finding with respect 'to the proper amount or type of restitution.'" (quoting 18 U.S.C. § 3664(e)).  Each victim's Financial Impact Statement Worksheet is submitted as an exhibit hereto.  The United States Attorney's Office (USAO) sent these worksheets to each one of the victims to complete and return to the USAO to account for each victim's loss.  For clarity's sake, and as noted above, the United States notes that only Todd Stockton's expenses are likely to require an evidentiary hearing to determine whether they are the direct result of Defendant's fraudulent scheme, or Stockton's participation in the investigation or prosecution of this case, and thus compensable under the MVRA.

1.   *The Mandatory Victim Restitution Act (MVRA) governs this case, Defendant's patients are "victims" under the MVRA, and their harms are compensable under MVRA.*

The MVRA provides that, for certain crimes, "the court shall order...that the defendant make restitution to the victim of the offense." 18 U.S.C. § 3663(a)(1).  Wire Fraud — the charge of conviction in this case — is a qualifying offense under the MVRA.  18 U.S.C. § 3663A(c)(1)(A)(ii) (applying MVRA to "an offense against property ... committed by fraud or deceit"); *United States v. Gallant*, 537 F.3d 1202, 1248 (10th Cir. 2008) ("A guilty verdict for wire fraud...necessarily establishes the existence of a scheme to defraud [under the MVRA].").  Because restitution in this case is mandatory, the Court shall impose it without consideration of Defendant's financial resources.  *Id.* § 3663A(f)(1)(A) (providing that in "each" restitution order, the court "shall" order restitution to "each" victim in the full amount of each victim's losses," without consideration of the economic circumstances of the defendant).

For purposes of the MVRA, a "victim" is:

a person *directly and proximately* harmed as a result of the commission of an offense for which restitution may be ordered *including*, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person *directly harmed* by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern.

18 U.S.C.. § 3663A(a)(2) (emphasis added).  The Tenth Circuit has explained that in defining "victim" in that way, the MVRA outlined "two separate ways an individual can be a victim under the MVRA":

[1] if the person is "directly and proximately harmed as a result of the commission of an offense" covered by the MVRA; [2] if the defendant's crime includes an element that the defendant engaged in "a scheme, conspiracy or pattern of criminal

activity," then the person will be a victim if he is "directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern of criminal activity."

*United States v. Speakman*, 594 F.3d 1165, 1169 (10th Cir. 2010) (quoting 18 U.S.C. § 3663A(a)(2)); *see also Gallant*, 537 F.3d at 1248 ("A victim under the MVRA is someone who is 'directly harmed by the defendant's criminal conduct in the course of the scheme.'" (quoting 18 U.S.C. § 3663A(a)(2)); *United States v. Gordon*, 480 F.3d 1205, 1211 (10th Cir. 2007) (same). Notably, *Speakman* recognized:

> The first of these definitions is in some ways broader because it requires only that the individual be harmed "as a result of" the defendant's offense, and not "in the course of" the offense. The first clause also "includ[es]" the second, which applies only to those crimes that involve, as an element, a scheme, conspiracy, or pattern of criminal activity, and even then applies only when the individual is harmed "in the course of the scheme, conspiracy, or pattern." It thus follows that an individual could be deemed a victim by meeting the first criteria only, and not the second.

*Speakman*, 594 F.3d at 1169-70. Significantly, when "the defendant commits wire fraud, an individual will be deemed a victim so long as he was directly harmed in the course of the scheme" because wire fraud "includes as an element a 'scheme' to defraud." *Id*. at 1170 (citing *Gallant*, 537 F.3d at 1248).

Defendant's patients who seek restitution fall within both definitions of "victim" under the MVRA. *Speakman*, 594 F.3d at 1169-70. Turning initially to the second definition, the Tenth Circuit has recognized that wire fraud inherently involves a scheme to defraud, and therefore Defendant's patients are "victims" under the MVRA so long as they were "directly harmed in the course" of Defendant's scheme to defraud. As to the "in the course of the scheme" requirement, there is no dispute that the harm for which each victim is seeking redress arose before Defendant's fraud had "run its course." *Compare id.* at 1170 (insurance company not "victim" because the harm

that the United States claimed the company endured arose after the conclusion of the defendant's scheme). Defendant's patients also meet the "directly harmed" requirement. *Id*. The Tenth Circuit has stated that "direct harm" under the MVRA is akin to "'but-for' causation." *Id*. at 1171. "But-for" causation is the notion that "a particular loss would not have occurred but for the conduct underlying the offense of conviction." *Id*. (quoting *In re Antrobus*, 519 F.3d 1123, 1126 (10th Cir. 2008) (Tymkovich, J., concurring)). The harm for which Defendant's victims seek redress here is the fraud itself — that is, the fact that because of Defendant's false statements and claims about his Lyme Disease treatment being administered on some 3,000 patients at a 100 percent success rate, the victims did not get the treatment that they believed they purchased. Clearly, Defendant's false statements are the direct cause of the victims not receiving the product they believed they were purchasing. Absent Defendant's fraud the patients would not incurred the losses — paying $5,000 for the treatment, traveling to New Mexico to undergo the treatment, and so on.

Defendant's patients are also "victims" under the MVRA's first definition of "victim" because they were "directly and proximately harmed as a result of" Defendant's fraud. *Id*. As to "direct harm," as discussed above, Defendant's fraud easily passes the threshold of "but-for" causation because absent his fraudulent scheme is the reason the patients traveled to Las Cruces and obtained Defendant's treatment. *Id*. As to proving that Defendant "proximately harmed" the victims, the United States must prove that the victim was "proximately harmed" — in other words, that the "causal connection between the conduct and the loss is not too attenuated (either factually or temporally)." *Id*. Here, there is no attenuation — factually or temporally — between the losses the victims incurred in receiving Defendant's Lyme Disease treatment, and the victims have made the requisite showing. Accordingly, Defendant's suggestion that his patients are not "victims" under

the MVRA unless they expressed dissatisfaction with his services before this prosecution's inception lacks merit and loses sight of the fact that Defendant's offense of conviction is fraud.

As to identifying the victims' harms that were caused by Defendant's offense of conviction, the MVRA outlines the harms for which a defendant must pay restitution based on whether Defendant's offense resulted in: (1) damage or loss of property to a victim, (2) bodily injury to a victim, (3) bodily injury resulting in the death of a victim, and (4) expenses incurred by victims during participation in the investigation or prosecution.  *See* 18 U.S.C. § 3663A(b) (subsections (b)(1) through (b)(4) are conjunctive, thereby requiring a defendant to pay restitution for different types of harms to a single victim).  More generally, in determining if a specific harm is compensable harm under the MVRA, the harm must also have been "directly and proximately" caused by Defendant's offense.  *See United States v. Williams*, 292 F.3d 681 (10th Cir. 2002) (citing 18 U.S.C. § 3663A(a)(2)).  As noted above, "direct and proximate" harm connotes causation-in-fact and legal causation.  "Reasonable foreseeability" embodies both of these standards of causation.  *See, e.g.*, USSG § 2B1.1(b)(1) & cmt. n.3(A) ("For purposes of this guideline, 'reasonably foreseeable pecuniary harm' means pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense."); *see also id.* § 1B1.3(a)(1)(B) (relevant conduct, in cases involving jointly undertaken criminal activity, "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity").  Where harms are caused by sources in addition to the defendant's criminal conduct, restitution may be imposed for all the harm so long as the intervening causes are sufficiently related to the offense conduct of the defendant.  *See, e.g.*, *United States v. Meksian*, 170 F.3d 1260 (9th Cir. 1999) (analyzing four fact patterns involving intervening causes of harm); *see generally United States v.*

*Gordon*, 480 F.3d 1205, 1210-11 (10th Cir. 2007) (restitution amount must be "causally linked" to a defendant's scheme to defraud).

Applying these principles here, because Defendant's scheme clearly resulted in property loss to the victims, Defendant must be ordered to repay the victims the fees that Defendant charged them related to their respective Lyme disease treatments. *See* 18 U.S.C. § 3663A(b)(1)(A) (where offense resulted in property loss the district court shall require the defendant to return the property to its owner). Additionally, many of Defendant's victims also seek compensation for: (1) travel expenses the victims incurred to obtain Defendant's treatment in Las Cruces, New Mexico; (2) medical expenses the victims incurred as a result of Defendant's treatment; and (3) lost income. These harms each warrant brief discussion.

First, as already noted, after the Court finds that Defendant's scheme resulted in property loss to a victim, the MVRA requires that Defendant repay such victims the value of the property that they lost as a direct and proximate result of Defendant's offense. The expenses that the victims incurred in traveling to Defendant's clinic, and staying in Las Cruces while they underwent Defendant's multi-day treatment, are compensable because they were "reasonably foreseeable" to Defendant at the time of his offense. Defendant, as detailed below, became aware that nearly all of his victims would have to travel to Las Cruces to receive his multi-day treatment in the communications he had with the victims prior to their undergoing the treatment. The fact that Lyme disease is extremely rare in New Mexico, *see supra* note 1, eliminates any lingering doubt about the foreseeability of these expenses. Indeed, nearly all of Defendant's victims traveled to his Las Cruces clinic from outside New Mexico. Pursuant to the MVRA, this Court must require Defendant to compensate the victims for their reasonably foreseeable travel expenses that were caused by his fraudulent scheme. *See* 18 U.S.C. § 3663A(b)(1).

Second, as to the victims who the Court finds suffered bodily injury as a result of Defendant's treatment, the MVRA expressly requires Defendant to pay victims "an amount equal to the cost of necessary medical and related professional services and devices" as specified in 18 U.S.C. § 3663A(b)(2)(A).  That the victims might require medical attention after undergoing Defendant's Lyme disease treatment, and therein incur medical expenses, was entirely foreseeable to Defendant at the time of his offense.  Defendant's offense involved administering his non-FDA approved cocktail of drugs to the victims intravenously.  Defendant knew that many of his victims had previously been diagnosed with Lyme disease, and that many of them had exhausted traditional treatments without success and were suffering debilitating side effects of that condition.  And, of course, Defendant knew that this Lyme disease treatment had not — as he falsely claimed to his victims — been widely administered with overwhelming success.  *See, e.g.*, *United States v. Metzger*, 233 F.3d 1226, 1227-29 (10th Cir. 2000) (holding that the guideline "loss" calculation in a bank robbery included the costs of an injury to a bystander shot by an off-duty police officer during the robbery, because the injury was a reasonably foreseeable result of the inherently dangerous activity of robbing a bank); *United States v. Lewis*, 155 F. App'x 897, 899 (7th Cir. 2005) (defendant convicted of passing a counterfeit check was properly ordered to pay $19,177 for worker's compensation paid to a police officer who was injured while apprehending the defendant, where defendant's plea agreement included a stipulation whereby he agreed to pay for all losses "related to" his offense).

Third, as to lost income, the MVRA expressly requires Defendant reimburse a victim for lost income caused by Defendant's offense if  the Court finds:  (1) the victim suffered bodily injury as a result of Defendant's treatment, *see* 18 U.S.C. § 3663A(b)(2)(C); or (2) the victim lost income "during participation in the investigation or prosecution of the offense or attendance at proceedings

related to the offense." *Id*. § 3663A(b)(4).  In other words, absent a finding that Defendant's offense caused a victim bodily injury or that the claimed lost wages were incurred as part of this case, to be compensable under the MVRA, a victim's lost income must constitute part of the "property" the victim lost as a result of Defendant's offense.  *Compare Wilfong*, 551 F.3d at 1184 (affirming restitution order requiring a defendant to repay an employer the value of the lost employee work time entailed by his phony bomb threat, and recognizing that "[a]n employee's work time is the property of the employer").

> Under the MVRA:
>
> When property is damaged or lost and cannot be returned, the victim is entitled under the plain language of the statute to receive as restitution an amount equal to "the value of the property on the date of the damage, loss, or destruction." 18 U.S.C. § 3663A(b)(1)(B)(i)(I).  The statute does not define the term "value," but one logical way to assess the value of the lost property is by its cost to the victim-how much the victim paid for the lost property.

*United States v. Wilfong*, 551 F.3d 1182, 1184 (10th Cir. 2008).  The Tenth Circuit has recognized that when the time for which an employer "compensated its employees was 'lost' because of someone's illegal acts,' it is just as significant a financial loss to the [employer] as, [for example] . . . food stamps [ar]e stolen and fraudulently used." *Id.* (quoting *United States v. Hand*, 863 F.2d 1100, 1103 (3d Cir. 1988)).  Applying *Wilfong*'s reasoning here, the MVRA requires that Defendant compensate his victims who lost income — for example, victims who were hourly employees whose employers did not pay or otherwise compensate them for medical leave — as a result of Defendant's offense.  *See* 18 U.S.C. § 3663A(b)(1).  Put another way, because Defendant was aware that the vast majority of his victims would have to travel to Las Cruces to undergo his Defendant's Lyme disease treatment, it was "reasonably foreseeable" that some of those victims would miss work and forego income in the hopes of being successfully treated by Defendant for their debilitating disease.  *See*

*generally Wilfong*, 551 F.3d at 1184 ("The Supreme Court has stated that the ordinary meaning of restitution is restoring someone to a position he occupied before a particular event." (quoting *Hughey v. United States*, 495 U.S. 411, 416 (1990)).

Despite the MVRA's plain text and the foregoing authorities, Defendant advances two equally unavailing arguments that his victims were not directly harmed by his fraud, and, consequently, not entitled to restitution.  First, he argues that some of his victims did not complain about the Lyme disease treatment and/or benefitted from the treatment and that they are merely seeking a financial "windfall" by reporting their financial losses.  (Doc. 48 at 20.)  Second, Defendant contends that he did not publicly advertise his fraud and that his victims either came to the clinic by referral or otherwise, and that, therefore, they should not be entitled to restitution despite the fact that several of them traveled great distances at considerable cost to receive the treatment under false pretenses.  (*Id.* at 21.)  In so arguing, Defendant relies on *United States v. Maurelo*, 76 F.3d 1304 (3d Cir. 1996) and *United States v. Hayes*, 242 F.3d (3d Cir. 2001), for the proposition that if a consumer receives satisfactory service, even if the service is fraudulently induced, the consumer suffers no loss and is not entitled to restitution.  (Doc. 48 at 20.)   More specifically, Defendant contends that his former Lyme disease patients who failed to complain about their treatment either during or shortly after their treatment, are not entitled to receive restitution. (*Id.*)

Notably, however, the United States Sentence Commission (the Commission) has disavowed both *Maurello* and *Hayes*.  In November 2001, just ten months after the Third Circuit issued Hayes, the Commission added the following Application Note to the Guidelines:

> In a case involving a scheme in which...services were fraudulently rendered to the victim by persons falsely posing as licensed professionals...loss shall include the

amount paid for the property, services or goods transferred, rendered, or misrepresented, with no credit provided for the value of those items or services.

USSG § 2B1.1, cmt. n.3(F)(v).  The Commission expressly identified *Maurello* as one of the two cases that prompted its decision to add this Application Note:

> This rule reverses case law that has allowed crediting (or exclusion from loss) in cases in which services were provided by persons posing as attorneys and medical personnel.  *See United States v. Maurello*, 76 F.3d 1304 (3d Cir. 1996) . . . .  The Commission determined that the seriousness of these offenses and the culpability of these offenders is best reflected by a loss determination that does not credit the value of the unlicensed benefits provided.

USSG supp. app. C, amend. 617.

Moreover, in *United States v. Curran*, 525 F.3d 74 (1st Cir. 2008), the First Circuit considered — and flatly rejected — the same argument Defendant makes here.  Specifically, the *Curran* defendant argued that his patients who did not complain about his fraudulent scheme and dubious medical treatment were not "victims" under the MVRA.  *Curran*, 525 F.3d at 78-82.  The *Curran* defendant practiced naturpathy, but held himself out as a medical doctor and purportedly diagnosed all manner of blood disease and recommended dubious treatments to at least 250 patients who paid in excess of $1,000,000 for his treatments.  *Id*.  The district court calculated loss under § 2B1.1 of the Guidelines to include money paid by patients who apparently had no problem with the treatment and/or benefitted from it.  *Id*.  On appeal, the *Curran* defendant took aim at the loss calculations in § 2B1.1 of the Guidelines on the same grounds that Defendant is trying to fight paying restitution here — *i.e.*, that patients are not "victims" if they did not complain about their treatment, or if the naturopathic treatments rendered had some benefit to the patients.  *Id*.  The First Circuit rejected that argument soundly noting that there was a sufficient causational link between the assessment of loss and the defendant's fraud where the defendant's charges "for the tests and

medications were shown to be inextricably linked to his misrepresentations, malpractice and fear-mongering." *Id*. at 81 (emphasis added). The *Curran* defendant raised the same argument in attacking the restitution order, but the First Circuit held that he had waived that issue. *Id*. at 84. Significantly, however, the First Circuit noted that the defendant's argument would have failed even if the court of appeals would have reviewed it for plain error. *Id.*

Additionally, in *United States v. Bhutani*, 266 F.3d 661 (7th Cir. 2006), the Seventh Circuit considered a case where the defendants were convicted of offenses related to the manufacture and distribution of mislabeled and/or adulterated pharmaceutical products. Specifically, the defendants sold consumers purported FDA-approved drugs, however, the drugs were not manufactured according to FDA regulations. *Id*. at 663-70. The district court measured the loss to the consumers based on the defendant's financial gain and rejected the defendant's argument that his gain was not the appropriate measure because there was no actual loss to consumers as none of the drugs were shown to be medically ineffective and there was no evidence that anyone fell ill or died. *Id*. at 668. Specifically, the district court held that the issue was whether the consumers got what they paid for, not whether the drugs were medically effective. *Id*. at 669-70. On appeal, the Seventh Circuit affirmed the district court's opinion and adopted its rationale wholesale. *Id*. at 670 ("The medical effectiveness of the drug or its dangerousness after adulteration ought not to be the core of the inquiry; rather, the district court was justified in determining that there was a loss because consumers did not get what they bargained for. We agree with the district court's decision that there was indeed loss to consumers because consumers bought drugs under the false belief that they were in full compliance with the law.").

Here, Defendant's victims may not have complained about the fraud before they knew there was a fraud, or even benefitted from Defendant's treatment, but none of the victims got what they

paid for — *i.e.*, a world-secret Lyme disease protocol co-developed by Defendant and used to treat 3,000 patients with a 100% success rate. Instead, they all got a dubious Lyme disease treatment concocted by Bradford and used to treat a hand-full of patients with varying results. If the victims knew precisely what they were buying, they would not have so eagerly handed their credit cards to Defendant and agreed to pay more than $5,000 for a single treatment. The MVRA requires that Defendant be ordered to compensate all of the victims of his offense, regardless of whether or when they complained about the services Defendant rendered, and for the harms detailed below.

B.   Defendant's Lyme disease patients were directly harmed by Defendant's scheme to defraud because they paid for a treatment they did not receive, *i.e.*, a Lyme disease protocol co-developed by Defendant that had successfully treated over 3,000 patients.

As outlined herein, the United States has identified 21 victims of Defendant's fraudulent scheme who have claimed restitution, and has itemized their compensable losses.[7] To the extent that some of the victims' compensable losses are not supported by receipts or other documentation, the Court can make a reasonable restitution determination based on the information presented and with an eye towards achieving fairness to the victims. When calculating loss under the MVRA, absolute precision is not required. *United States v. Ahidley*, 486 F.3d 1184, 1189 (10th Cir. 2007); *United States v. Teehee*, 893 F.2d 271, 274 (10th Cir.1990) (noting that "[t]he determination of an appropriate restitution amount is by nature an inexact science"). A sentencing court may resolve restitution uncertainties "with a view towards achieving fairness to the victim," so long as it still makes a "reasonable determination of appropriate restitution" rooted in a calculation of actual loss.

---

[7] This list of 21 victims does not include Lyme disease patients who have failed to claim restitution. Therefore, the United States does not know what their compensable losses are and requests 90 days from the date of sentencing to determine their losses. 18 U.S.C. § 3664(d)(5). As noted above, this list also does not include Tommy Bickle who was identified in the PSR as a victim, but was not diagnosed or treated for Lyme disease at the clinic.

*United States v. Vaknin*, 112 F.3d 579, 587 (1st Cir. 1997) (quotation omitted).  Accordingly, "in the case of fraud or theft, the loss need not be determined with precision.  The court need only make a reasonable estimate of the loss, given the information available." *United States v. Jackson*, 155 F.3d 942, 949 n.3 (8th Cir. 1998) (internal quotation marks and citation omitted).  The identified victims and their compensable losses that are identified at this time are as follows[8]:

- Carol Munson.  Defendant has no objection to paying restitution to Carol Munson in the amount of $6,283.44 which is the full amount of restitution claimed.  Attached as Exhibit 1 is a Financial Impact Statement Worksheet that itemizes Munson's compensable expenses as follows:

    | | |
    |---|---|
    | Cost of Defendant's Lyme disease treatment: | $5,110 |
    | Lodging: | $411.62 |
    | Gas: | $476.91 |
    | Food: | $284.91 |

    These itemized expenses total $6,283.44. Therefore, the United States respectfully requests that the Court order Defendant to pay restitution to Carol Munson in an amount not less than $6,283.44.

- Todd Stockton.  Defendant has no objection to paying restitution to Stockton in the amount of $8,959.33.  Therefore, the United States respectfully requests that the Court sentence Defendant to pay restitution to Todd Stockton in an amount not less than $8,959.33.  Attached as Exhibit 2 is a Financial Impact Statement Worksheet that itemizes Stockton's expenses.  As stated above, an evidentiary hearing is likely going to be necessary to litigate whether the expenses above and beyond the cost of Defendant's Lyme disease treatment are a direct result of Defendant's fraud, or Stockton's participation in the investigation or prosecution of this case.

---

[8]  Neither the $159,110.53 figure noted throughout this response, nor the compensable losses outlined below, include pre-judgment interest.  The United States hereby respectfully requests that the Court order Defendant to pay pre-judgment interest on each victim's individual losses.  Nor do the loss figures include the lost income attributable to Defendant's offense that some of the victims may be entitled to under the MVRA, and for which the United States requests 90 days to determine what, if any, lost wages incurred by these victims as a result of Defendant's offense.  *See* 18 U.S.C. § 3664(d)(5).  Finally, victim Todd Stockton's compensable losses may also increase if an evidentiary hearing is needed on his claimed losses, as noted herein.  *See also supra* note 7.

- **Kathleen and James Hallman**.  Defendant objects to paying any amount of restitution to Kathleen or James Hallman.  Kathleen Hallman contacted Defendant by telephone in 2008 because she was very sick and had seen a naturopathic doctor in Oregon who thought she had Lyme disease.  During the conversation, Defendant told Hallman: (1) that Defendant's father was an expert on diseases involving parasites, (2) that he had contracted Lyme disease from tick bites while living in Florida and that his father developed a formula which cured him of the disease, (3) that her family could be at risk of contracting the disease because Lyme disease is communicable; and (4) that Hallman's pregnant daughter, Stephanie Anderson, was at risk of contracting Lyme disease and passing it on to her unborn child.  Because of Defendant's false representations, Kathleen Hallman received Defendant's Lyme disease treatment, and, as more fully explained below, so did her husband James, her daughter Stephanie, and her son-in-law Dan Anderson.  The Hallmans paid the airline expenses and the cost of the Lyme disease treatment for Stephanie and Dan Anderson, as well as for themselves.  On November 6, 2008, the Hallmans traveled from Oregon to Las Cruces to receive their treatment together.  They returned to Oregon on November 20.  The Hallmas returned for a second round of treatment from January 24-31, 2009.  During this trip, Dan and Stephanie Anderson received their treatments.  James Hallman had never been diagnosed with Lyme disease, but he elected to receive the treatment because of Defendant's false representation that the disease was communicable.  Defendant's statements to Kathleen and James Hallman were  false.  First, Dr. Haese was not an expert in treating parasitic diseases.  Rather, he possessed degrees in hematology and pathology (PSR at 8, ¶ 22.)  Moreover, he purchased the "Bradford Microscope" because he was interested in blood and wanted to examine nutritional levels in blood, not to aid in the diagnosis of Lyme disease. (*Id.*)  Additionally, Defendant was treating patients using a protocol developed by Bradford.  Second, Defendant never had Lyme disease.  In fact, when he spoke to SA Blair, he said that was not sure if he had Lyme disease.  He suspected he had Candida in his blood that he attributed to eating a lot of dairy, including yogurt and blue cheese.  Third, Lyme disease does not spread from one person to another and transfer of the bacteria from an infected pregnant woman to the fetus is *extremely* rare.  *See* www.health.ny.gov/diseases/communicable/lyme/ (last visited Dec. 31, 2011).  Attached as Exhibit 3 is the Hallman's Financial Impact Statement Worksheet itemizing their expenses regarding their treatments in November 2008.  Attached as Exhibit 4 is the Hallman's Financial Impact Worksheet itemizing their expenses regarding their treatments in January 2009 and the Anderson's treatments in January 2009 as follows:

| | |
|---|---|
| Cost of Lyme disease treatment for Kathleen Hallman: | $10,260.76 |
| Cost of Lyme disease treatment for James Hallman: | $3,780 |
| Cost of Lyme disease treatment for Dan Anderson: | $4,049 |
| Cost of Lyme disease treatment for Stephanie Anderson | $4049 |
| Meals: | $673.22 |
| Sundry Costs: | $287.66 |
| Lodging: | $1278.19 |
| Rental: | $431.93 |

| | |
|---|---|
| Fuel: | $55.15 |
| Travel: | $395 |

These itemized expenses total $25,259.91.  Therefore, the United States respectfully requests that the Court sentence Defendant to pay restitution to Kathleen and James Hallman in an amount not less than $25,259.91.

- <u>Dan and Stephanie Anderson</u>.  Defendant objects to paying any amount of restitution to Dan and Stephanie Anderson. Stephanie Anderson visited the clinic at the request of Stephanie Anderson's mother, Kathleen Hallman, because Defendant claimed that Lyme disease was communicable.  Notably, neither one of the Andersons had ever been diagnosed with Lyme disease prior to meeting Defendant.  Defendant analyzed their blood under the "Bradford Microscope" and told Dan Anderson that he had "sticky blood" and that Lyme disease is a communicable disease and that he should undergo the Lyme disease treatment. Defendant also analyzed Stephanie Anderson's blood and told her that she had the beginning stages of Lyme disease.  Defendant told the Andersons: (1) that he had a very high success rate treating people for Lyme disease, and (2) that his father developed the Lyme disease protocol and that he was carrying on his father's work.  Based on those fraudulent representations, Dan and Stephanie Anderson both agreed to the treatment.  They traveled to Las Cruces on January 25, 2009 and returned on January 31.  The Hallmans paid for the treatments and airline expenses and all other expenses were born by the Andersons.  Attached as Exhibit 5 is a Financial Impact Statement Worksheet itemizing the Anderson's compensable expenses as follows:

| | |
|---|---|
| Hotel: | $759.68 |
| Car Rental: | $436.74 |
| Food: | $364.08 |
| Gas and luggage fees: | $72.12 |

These itemized expenses total $1,632.62.  Therefore, the United States respectfully requests that the Court sentence Defendant to pay restitution to the Dan and Stephanie Anderson in an amount not less than $1,632.62.

- <u>Julia Besner</u>.  Defendant objects to paying any amount of restitution to Julia Besner (Besner).  Besner had been diagnosed with Lyme disease by a doctor in Florida and the disease was confirmed through an independent lab test also performed in Florida.  Besner consulted with Defendant regarding his treatment and Defendant advised her that (A) he had personally treated over 3,000 patients for Lyme disease; and (B) that he had a 100% success rate treating patients.  Besner received two different treatments.  The first treatment was in June 2008 and the second treatment was in August 2008.  Attached as Exhibit 6 is a Financial Impact Statement Worksheet itemizing Besner's compensable expenses as follows:

| Cost of Lyme disease treatments: | $13,715 |
|---|---|
| Airline tickets: | $2,812[9] |
| Rental (car and home in Las Cruces during treatments): | $4350 |

These itemized expenses total $20,877.  Therefore, the United States respectfully requests that the Court sentence Defendant to pay restitution to Besner in an amount not less than $20,877.

• Jennifer and Alan Schuetz.  Defendant does not object to paying $10,270 to the Schuetzs for the costs of their Lyme disease treatments.  He does, however, object to paying costs for their lost wages and travel.  In November 2005, Jennifer Schuetz was diagnosed with Lyme disease by a doctor in Kansas City, MO.  Jennifer Schuetz contacted Defendant regarding his treatment and received the treatment in December 2008.  Prior to receiving the treatment, Jennifer Schuetz spoke to Defendant multiple times on the telephone and Defendant told her: (1) he co-developed a protocol to cure Lyme disease; (2) that he had treated over 3,000 patients for the disease; (3) that 87% of the patients he treated only needed one treatment to cure the disease and that he had cured 100% of his patients; (4) that he possessed eight medical degrees; and (5) that Lyme disease was contagious and that her husband, Alan Schuetz, probably had Lyme disease, too.  Defendant then examined Alan Schuetz's blood under the "Bradford Microscope"and told him that his blood was more diseased than his wife's blood and that if he did not get the treatment that he would contaminate his wife again.  Notably, Alan Schuetz had not been previously diagnosed with Lyme disease when he came to the clinic, and suffered none of the same symptoms his wife had.  Nevertheless, the Schuetzs both agreed to the treatment.  Attached as Exhibit 7 is a Financial Impact Statement Worksheet that itemizes the Schuetzs' compensable expenses as follows:

| Cost of Lyme disease treatment for Alan Schuetz: | $5,135 |
|---|---|
| Cost of Lyme disease treatment for Jennifer Schuetz: | $5, 135 |
| Airfare: | $1,131 |
| Rental car: | $241.60 |
| Hotel: | $786.76 |
| Food: | $300 |
| Lost wages: | TBD[10] |

---

[9]  Besner has attached airline ticket receipts for her passenger, Melody Besner, however, the United States did not include that cost in its calculation.

[10]  Either Jennifer or Alan Schuetz (or both) were unable to return to work after the treatment because of the treatment's troublesome side effects. The United States, however, does not currently have an accurate accounting of those lost wages and respectfully requests ninety (90) days to submit those losses to the Court.  See 18 U.S.C. § 3664(d)(5).

These itemized expenses total $12,729.36 at this time.  *See supra* note 10.  Therefore, the United States respectfully that the Court sentence Defendant to pay restitution to Jennifer and Alan Schuetz in an amount not less than $12,729.36.  The United States further requests the Court to permit the United States 90 days to determine what, if any, lost wages incurred by the Schuetzs as a result of Defendant's offense.  *See* 18 U.S.C. § 3664(d)(5).

- Amanda Winkle.  Defendant does not object to paying Winkle restitution in the amount of $5,478 for the cost of the Lyme disease treatment.  He objects, however, to paying any additional restitution.  Winkle has been suffering from Lyme disease for approximately 12 years and had been diagnosed by two healthcare professionals prior to meeting Defendant.  Winkle received treatment for Lyme disease from Defendant from January 4, 2009, through January 13, 2009.  Prior to her treatment, Defendant told Winkle:  (1) that he was a doctor, (2) that he had successfully treated and cured over 3,000 patients for Lyme disease, and (3) that he had a patent on the drugs he used to treat the disease.  Also prior to the treatment, Defendant examined Winkle's blood under the "Bradford Microscope" and told her that she had Lyme disease and "sticky blood."  Winkle then received the seven-day "Bradford Protocol."  Attached as Exhibit 8 is a Financial Impact Statement Worksheet that itemizes Winkle's compensable expenses as follows:

  | | |
  |---|---|
  | Cost of Lyme disease treatment: | $5,478 |
  | Lodging: | $688.46 |
  | Meals: | $434.35 |
  | Travel: | $1,036 |
  | Rental car: | $264.78 |
  | Misc. expenses: | $78.55 |

  These itemized expenses total $7,980.14.  Therefore, the United States respectfully requests that the Court sentence Defendant to pay restitution to Amanda Winkle in an amount not less than $7,980.14.

- Richard and Donna LaBrenz.  Defendant does not object to paying restitution to Richard and Donna LaBrenz in the amount of their medical expenses, but objects to paying additional restitution.  Donna LaBrenz was diagnosed with Lyme disease by a conventional doctor prior to meeting Defendant.  During the LaBrenzs' initial consultation with Defendant, Defendant advised them:  (1) that he had successfully treated numerous people for Lyme disease, (2) that Lyme disease was a communicable disease and that Richard should be tested, and (3) that he co-developed the Lyme disease protocol with his father and Bradford.  Defendant examined the LaBrenzs' blood under the "Bradford Microscope" and told both of them that they had Lyme disease, even though Richard LaBrenz had never been previously diagnosed with Lyme disease and did not exhibit any Lyme disease symptoms.  Nevertheless, both Richard and Donna LaBrenz received the treatment.  Both became extremely sick from the treatment and considered going to the hospital.  Donna LaBrenz experienced severe vomiting, diarrhea, was reduced to crawling to reach the hotel bathroom, and was bedridden for approximately 20 hours after receiving one of Defendant's

intravenous treatments. Several months later, Defendant advised Donna LaBrenz that she needed a second treatment and told Richard LaBrenz that he did not need any further treatments, even though Defendant refused to perform a blood test on him to see if Richard LaBrenz still had the disease. In March 2011, Richard LaBrenz contacted Defendant to try and recover medical expenses and Defendant told him that he had "beaten the federal charges" and that he was only charged with mail fraud which was no big deal. Attached as Exhibit 9 is a Financial Impact Statement Worksheet that itemizes the LaBrenz's compensable expenses as follows:

| | |
|---|---|
| Cost of Lyme disease treatment for Richard LaBrenz: | $3,400 |
| Cost of Lyme disease treatment for Donna LaBrenz: | $10,061 |
| (two treatments) | |
| Lodging: | $1,515.04[11] |
| Rental car: | $253.55 |
| Travel: | $1,281 |
| (four round-trip tickets) | |

These itemized expenses total $16,510.59. Therefore, the United States respectfully requests that the Court sentence Defendant to pay restitution to Richard and Donna LaBrenz in an amount not less than $16,510.59.

• <u>Joseph Arrivi</u>. Defendant objects to paying any amount of restitution to Arrivi. Arrivi had been previously diagnosed with Lyme disease and contacted Defendant regarding his treatment. During his telephone conversations with Defendant, Defendant advised Arrivi that he: (1) treated approximately 3,000 people for Lyme disease; (2) had a very high success rate curing Lyme disease; (3) contracted Lyme disease while living in Florida with his father; (4) co-developed a top-secret Lyme disease protocol; and (5) received his father's treatment which eradicated the disease. Arrivi received the treatment and became very sick within two days after receiving the treatment. The sickness consisted of dizziness, loss of appetite, severe back pain, and a burning feeling in his blood like acid was running through his body. Arrivi completed his seven day therapy but checked into a hospital a second time for the same symptoms. Defendant explained that the symptoms were part of his detoxification process of ridding his body of the disease, however, upon information and belief, no other patients experienced similar side effects. Attached as Exhibit 10 is a Financial Impact Statement Worksheet that itemizes Arrivi's compensable expenses as follows:

---

[11]  The LaBrenz's paid $872.08 to stay at the Staybridge Suites from January 6-14, 2009 during their initial treatments. They paid $153.60 to stay at the Springhill Suites from January 4-5, 2009, and $489.36 to stay at the Comfort Suites from March 15-22, 2009, during Donna LaBrenz's second treatment.

| | |
|---|---|
| Cost of Lyme disease treatment: | $5,410 |
| Consultation with Defendant re: treatment: | $250[12] |
| Installation of PICC Line for IV treatment: | $577 |
| Radiology: | $121.02[13] |
| Memorial Medical Center post-treatment care: | $3,519.71[14] |
| Moutainview Hospital ER post-treatment care: | $1,842.58[15] |
| Clinical pathology bloodwork: | $74.07[16] |
| Las Cruces shuttle: | $70[17] |
| Hotel: | $364.51 |
| Bus Fare: | $30[18] |

---

[12]  On February 5, 2009, Arrivi consulted with Defendant regarding his medical issues. During the consultation,  Defendant examined Arrivi's blood under the "Bradford Microscope" and advised Arrivi that he had Lyme disease and that he would need two or three Lyme disease treatments. Arrivi traveled by air from Las Vegas to El Paso for the consultation.  A friend of his picked him up at the El Paso airport and drove him to the clinic.  The same friend then drove him home to Las Vegas.

[13]  The Radiology Department at the Imaging Center (where the PICC Line was inserted) visually inspected the PICC Line to ensure that it was installed properly.

[14]  Within days after receiving Defendant's Lyme disease treatment, Arrivi experienced numerous physical complications, including acid reflux, dizziness, loss of appetite, back pain, numbness, and difficulty breathing.  Because of these complications, Arrivi had to be taken to the Memorial Medical Center in Las Cruces (MMC) for emergency treatment.

[15]  Arrivi also went to Mountain View Hospital in Las Cruces for treatment because of his post-Lyme disease complications.

[16]  After Arrivi reported his post-Lyme disease complications to Defendant, Defendant advised him to have his blood examined by an independent lab.

[17]  On February 18, 2009, Arrivi began receiving his Lyme disease treatment.  To receive the treatment, he traveled by air from Las Vegas to El Paso.  He then took a shuttle from the El Paso airport to his hotel in Las Cruces.

[18]  During the time Arrivi was receiving his Lyme disease treatment, he purchased a bus pass and took the bus from the hotel to the clinic and from the hotel to the grocery store to buy food.

|              |               |
|--------------|---------------|
| Airfare:     | $557.20[19]   |
| Food:        | $180          |
| Gas:         | $50[20]       |

These itemized expenses total $13,046.09. Therefore, the United States respectfully requests that the Court sentence Defendant to pay restitution to Joseph Arrivi in an amount not less than $13,046.09.

• <u>Karen Carver</u>. Defendant objects to paying any amount of restitution to Carver. In 2008, Carver consulted with Dr. Haese who diagnosed her with Lyme disease. At the time, Carver was a 24-year-old waitress who did not make much money and saved her tip money in an envelope to pay for the treatment. Because Carver did not have $5,000 to pay for the treatment, Dr. Haese reduced the fee to $3,000. When Carver went to the clinic to receive her first treatment on a Monday, she learned that Dr. Haese had passed away over the weekend, and she was told that Defendant would treat her. As the treatment progressed, it changed from the protocol Dr. Haese prescribed. When Carver asked for Dr. Haese's treatment plan, she was told that the clinic did not have it. Carver asked Defendant why her treatment changed, and Defendant told her that it was because she did not pay the full $5,000 for her treatment. Carver's PICC Line, by which the clinic administered her original treatment, became infected. As a result, Carver had to go to an emergency room (ER) to have the line removed and be tested for infection. Carver returned to the hospital the next day to have the PICC line reinserted. The hospital informed Carver that the line was dangerously infected, however, Defendant insisted that it was not infected and advised Carver that she did not need any antibiotics. Attached as Exhibit 11 is a Financial Impact Statement Worksheet that itemizes Carver's compensable expenses as follows:

|                                 |           |
|---------------------------------|-----------|
| Cost of Lyme disease treatment: | $3,000    |
| Haese invoices:                 | $91.81    |
| LC Radiology for PICC Line:     | $76.81    |
| MMC PICC Line removal:          | $87.28    |
| MMC PICC Liin re-insertion:     | $312.27   |

These itemized expenses total $3,568.17. Therefore, the United States respectfully requests that the Court sentence Defendant to pay restitution to Karen Carver in an amount not less than $3,568.17.

---

[19] The airfare includes a one-way ticket from Las Vegas to El Paso in order to meet with Defendant during the consultation, and a round-trip ticket to and from Las Vegas to receive the Lyme disease treatment.

[20] As stated above, when Arrivi flew from Las Vegas to El Paso for his initial consultation, his friend picked him up at the airport and drove him to the clinic. The friend then drove him home to Las Vegas. Arrivi paid her $50 in cash to help pay for the gas.

- Max Shindler, Margaret Smith, Tawnya Smith, Jack Pitre, and Chloe Lohmeyer. Defendant objects to paying any amount of restitution to these former Lyme disease patients. Tawnya Smith had previously been diagnosed with Lyme disease before she contacted Defendant. When she spoke to Defendant on the telephone, Defendant advised her that he had treated 3,000 people for Lyme disease with a very high success rate.  Smith and her family members: Max Schindler, her step-father; Margaret Smith, her mother; Jack Pitre, her husband; and Chloe Lohmeyer, her daughter, all received Defendant's treatment. Max Shindler paid a total of $34,995.74 to Defendant to ensure that everybody in his family received the treatment.  Attached as Exhibit 12 is the Financial Impact Statement Worksheet regarding Mr. Shindler's expenses as follows:

        Cost of Lyme disease treatments:     $32,426

        Hotel/travel/food                    $2,569

    These itemized expenses total $34,995.  Therefore, the United States respectfully requests the Court to sentence Defendant to pay restitution to Max Shindler in an amount not less than $34,995.

- Karen Poole. Defendant does not object to paying Poole restitution in the amount of $5,110 for the cost of her Lyme disease treatment, but does object to paying Poole any additional restitution.  Poole had been previously diagnosed with Lupus prior to meeting Defendant. Poole contacted Defendant regarding treatment and Defendant examined her blood under the "Bradford Microscope." Defendant advised Poole that she had Candida/fungus in her blood and also told her that she had Lyme disease and needed the "Bradford Protocol."  Notably, Poole had never previously been diagnosed with Lyme disease.  Defendant told Poole:  (1) he had personally treated over 3,000 patients for Lyme disease and had a very high cure rate, (2) he had studied Lyme disease under his father who he considered to be an expert on Lyme disease and was also a doctor, and (3) Lyme disease patients treated by him were cured of the disease.  Based on those representations, Poole decided to receive the nine-day Lyme disease treatment.  The treatment did not cure any of Poole's symptoms and the post-treatment care she received from Defendant was "terrible."  Defendant told her to wait three months and to call him if the symptoms were still present.  Defendant did not give her any post-treatment instructions, directions, or information about how to tell if the treatment was working.  Attached as Exhibit 13 is a Financial Impact Statement Worksheet that itemizes Poole's compensable expenses as follows:

        Cost of Lyme disease treatment:     $5,110

        Travel:                             $788

        Hotel:                              $795.10

        Rental care:                        $198.06

        Food:                               $377.72

    These itemized expenses total $7,268.88. Therefore, the United States respectfully requests that the Court sentence Defendant to pay restitution to Karen Poole in an amount not less than $7,268.88.

IV.     Conclusion

WHEREFORE, for all of the foregoing reasons, the United States respectfully requests the

Court to sentence Defendant to 33-months incarceration and further sentence him to pay not less

than $159,110.53 in restitution, plus pre-judgment interest, to all of the victims in the amounts

detailed above.  *See also supra* notes 7-8 (explaining why the $159,110.53 figure will almost

certainly increase when additional documentation and information is obtained from the victims).

Respectfully submitted,

KENNETH J. GONZALES
United States Attorney
/s/
***Electronically Filed 1/4/12***
MARK A. SALTMAN
ANDREA W. HATTAN
Assistant United States Attorneys
555 S. Telshor, Suite 300
Las Cruces, NM 88011
(575) 522-2304

I HEREBY CERTIFY that I electronically
filed the foregoing with the Clerk of the
Court using the CM/ECF system which
will send electronic notification to defense
counsel of record, as well as the United States
Probation Office, on this date.
/s/
***Electronically Filed 1/4/12***
MARK A. SALTMAN
Assistant United States Attorney