1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF NEW MEXICO

3

4  UNITED STATES OF AMERICA,

5        Plaintiff,

6    vs.                    2:10-CR-130-JAP

7  CARL EMANUEL HAESE,

8        Defendant.

9

10      Transcript of Sentencing Hearing before The Honorable
   James A. Parker, Senior United States District Judge, held in
11 Las Cruces, Dona Ana County, New Mexico, commencing on
   Thursday, March 22, 2012, at 4:48 p.m., and concluding at 6:41
12 p.m.

13

14 For the Plaintiff:  Mark Saltman, Esq.

15                     Andrea Hattan, Esq.

16

17

18 For the Defendant:  Jess Lilley, Esq.

19

20

21

22

23                     John De La Rosa, CCR
              United States Official Court Reporter
24              421 Gold Avenue, Southwest
              Albuquerque, New Mexico  87102
25                 Phone:  505.348.2249

1    (In open court.)

2    THE COURT:  Let's take up next Number 2010-130, United

3  States of America versus Carl Emanuel Haese.  Would counsel

4  state their appearances, please.

5    MR. SALTMAN:  Good afternoon, Your Honor, Mark Saltman

6  and Andrea Hattan for the United States.

7    MR. LILLEY:  Good afternoon, Judge, Jess Lilley on

8  behalf Mr. Haese, who is present.

9    THE COURT:  Let me ask Mr. Haese, have you read your

10  Presentence Report?

11    MR. HAESE:  Yes, sir.

12    THE COURT:  Have you discussed it with your attorney?

13    MR. HAESE:  Yes, sir.

14    THE COURT:  Are all of the statements of fact in your

15  report true and correct?

16    MR. LILLEY:  Judge, if I may, obviously, we filed an

17  extensive sentencing memorandum which addressed some of those

18  issues, and we would just stand by those issues.

19    Also, probation -- well, I was out of the office from

20  Friday to last night, and when I got in town last night,

21  obviously, I knew there would probably be another reissue of

22  the Presentence Report for some financial information.  I was

23  able to get it last night and review that as good as I could

24  with Mr. Haese this afternoon.  Most of the objections I have

25  to some of the factual situations in the Presentence Report,

1    Judge, I don't think require an evidentiary hearing.  They are

2    just our version of some of the things.  A lot of it was with

3    regards to one of the initial complainants, Todd Stockton, and

4    kind of revolved around an obstruction of justice which I know

5    the government has indicated that they are not going to proceed

6    with, so we would stand by all of those objections in our

7    sentencing memorandum.

8            With regard to the Presentence Report, I think there

9    were two within the last five days.  I think this one was

10   disclosed on the -- I think this was -- obviously, the second

11   one is the only one we care about.  This was disclosed on March

12   20th, and I do have a few comments with regards to those.  Most

13   of them, Judge, are comments with regards to probation trying

14   to obtain financial information, and to be honest with you,

15   it's written in a manner which makes it look like we're hiding

16   stuff or not responding, and I don't think anything could be

17   further from the truth.  I will go through some of those.

18           Before I get started on those, paragraph 68 is new, and

19   that's other criminal conduct.  I would ask that to be stricken

20   from the Presentence Report.  It is something that is an

21   allegation.  That was the first we knew about it.

22           THE COURT:  Well, let me make sure that I'm looking at

23   the same thing that you're referring to.  I'm looking at a

24   Presentence Report redisclosed March 16, 2012.  Is that the

25   correct one?

1          MR. LILLEY:  I had one disclosed March 16th, I had one

2   disclosed March 20th.  So I have March 20th.

3          THE COURT:  Okay.  What is the difference between March

4   20 and March 16?

5          MR. LILLEY:  Well, at least in the letter that I have,

6   I have a letter, a memorandum which explains what the

7   difference is if the court would like to look at it.  It is

8   dated March 20th from Mr. Rodriguez and explains that they

9   redisclosed one on the 16th, but there are some changes.

10         THE COURT:  Changes to the one on the 16th?

11         MR. LILLEY:  Yes.  These are the changes that were

12   made, Your Honor.  No major changes.  It is probably not much

13   different than the one on the 16th, Judge, other than the

14   number of victims and number of victims that responded is

15   probably...

16         THE COURT:  Well, this March 20 memorandum in the last

17   paragraph refers to Ms. Lesinsky's claim of loss, and that was

18   reported by the United States' Supplemental Response filed

19   March 6th where they had a victim impact -- copies of the

20   victim impact statement that showed her claim.

21         MR. LILLEY:  Correct, Judge.

22         THE COURT:  Do you dispute her claim?

23         MR. LILLEY:  Well, I don't dispute -- we're agreeing to

24   the 164,522.53, although -- we're agreeing to that amount of

25   restitution.  If I haven't seen anything with regards to

1    Ms. Lesinski's -- any documentation, I probably can't agree to

2    the amount, Judge, without seeing it first.  I assume,

3    obviously, she hasn't submitted any, so that's probably an

4    amount that we would argue that should be left pending.

5              THE COURT:  All right.  You don't dispute that there is

6    restitution owed of $164,522.53.  Is that right?

7              MR. LILLEY:  No, sir, we agree on that amount.

8              THE COURT:  I guess what we can do is order that amount

9    and leave open for 90 days the effort of Ms. Lesinsky to

10   provide more information.

11             MR. LILLEY:  Yes, sir.

12             THE COURT:  Would that be acceptable?

13             MR. LILLEY:  That's acceptable.

14             THE COURT:  What other matters?

15             MR. LILLEY:  Paragraph 68 is other criminal conduct,

16   and it is a report that a former employee of Mr. Haese has made

17   apparently to -- regarding some Medicaid -- probation did tell

18   me about this before I left town last week.  Obviously, I saw

19   it yesterday.  It is nothing we know about it.  We don't know

20   anything about this.  I think it's not -- I mean, we include

21   stuff that is relevant to sentencing, and I think an allegation

22   like this where we have no chance to respond other than we

23   disagree with it is not relevant for the Presentence Report,

24   shouldn't be relevant for sentencing.

25             THE COURT:  Now, I had this in paragraph 68 on page 24

1    of --

2              MR. LILLEY:  Same page, Judge.  I have the same thing.

3              THE COURT:  This is in the one disclosed March 16th.

4              MR. LILLEY:  I think it was in both of them, Judge.

5    Yes, sir.

6              THE COURT:  What's the government's position on

7    paragraph 68?

8              MR. SALTMAN:  May I have just a moment, Your Honor?

9              THE COURT:  Yes.

10             MR. SALTMAN:  Your Honor, we would object to having

11   paragraph 68 deleted from the Presentence Report.  It's -- it

12   is alleged conduct, but it is alleged conduct that occurred

13   after the crime of conviction in the defendant's guilty plea in

14   this case.  Of course, it is up to the court to decide how much

15   weight to give this alleged criminal conduct.  There have been

16   no charges filed that I'm aware of.  It is simply a police

17   report, but the government's position is that it is relevant to

18   sentencing, particularly given the defendant's crime of

19   conviction in this case, which is fraud.

20             THE COURT:  What is the consequence of leaving it in

21   the Presentence Report?

22             MR. LILLEY:  Well, Judge, I'm not a BOP expert, but

23   obviously, if the court were to give him time, we hope it

24   doesn't, but if the court were to give him time and he goes

25   into BOP, BOP classifies you as -- based upon everything in the

1    Presentence Report.  And obviously, BOP is going to read that.

2    I don't really know.  I can't represent to the court whether

3    that's going to give him a higher -- a more secure

4    classification or not, other than it shouldn't play a role

5    here.  There is nothing substantiated.  It is so -- I mean, if

6    we're going to rely upon a Presentence Report to include stuff

7    that's relevant for sentencing, and we're going to make an

8    allegation that's so far unsubstantiated, then it seems like

9    the Presentence Report would be fair game for any information

10   we wanted to put in there that was slanderous about anybody who

11   is making an allegation against Mr. Haese related to this case,

12   which is not really relevant.

13          MR. SALTMAN:  Your Honor, may I be heard again on this

14   issue?

15          THE COURT:  Go ahead.

16          MR. SALTMAN:  As the court is aware, often in a

17   Presentence Report there is alleged conduct 10, 20, 30 years

18   old, that never results in a conviction, but that information,

19   if the probation officer has it, is always included in a

20   Presentence Report.  The charge here, fraud, is -- it is hard

21   to imagine that it would have any effect on the defendant's

22   designation at a BOP facility because it is the same type of

23   offense for which he's been convicted of.  This isn't, for

24   instance, an unsubstantiated allegation of violent crime that

25   might result in the defendant being reclassified.  It is an

1    allegation of fraud, and the defendant in this case pled to

2    wire fraud.  So I can't imagine -- like Mr. Lilley, I'm no BOP

3    expert, but I can't imagine that this allegation would have any

4    effect on his classification in a BOP facility.  It is

5    certainly relevant information and information the court can

6    consider under 3553.

7             THE COURT:  I guess there are two different issues

8    here.  One is whether I take it into account in imposing

9    sentence, which I choose not to do.  The other issue is whether

10   it remains in the Presentence Report regardless of that.  So

11   you've got a ruling on half of it already.  So where do we go

12   from here?

13            MR. LILLEY:  I appreciate the first half of the ruling,

14   Judge.  I don't have much more to say on the second half of the

15   ruling.  I would just leave it up -- I stand by what I said.

16   I'll leave it up to the court's decision.  Obviously, we object

17   to it.

18            THE COURT:  I think I'll leave it in the Presentence

19   Report and not strike it, and then Mr. Haese can add whatever

20   he wants to the Presentence Report directed to it if he wishes.

21            MR. LILLEY:  Yes, Judge.  The only comment, I know the

22   court indicated it wouldn't take it into consideration, but

23   because the court has read it, you can't remove it from your

24   mind.  I can just tell the court that this party has refused to

25   pay to satisfy an agreement -- Yvonne Machete is a former

1    employee of the people who are now refusing to make payment,

2    and intend to try to get out of this, and are creating a

3    situation so they can try to reap benefits of a $350,000

4    contract.

5              THE COURT:  Is there litigation involving this?

6              MR. LILLEY:  No, there is not litigation, Judge.  I'll

7    get to that.  There is no litigation in that yet.  Mr. Haese,

8    you can see from the financial stuff, has absolutely zero

9    finances.  He's actually come to me.  It is not a situation,

10   the type of law that I do.  He's contacted a few attorneys.

11   When you're paying somebody $250 an hour on this type of big

12   civil litigation, it's not money that he has at this moment.

13   Especially when, if you had the money, you wouldn't be spending

14   it on this litigation.  It is an asset.  Once he can be more

15   stable financially, it will be something that he proceeds with.

16             THE COURT:  While we're talking about finances, let me

17   ask you about his house that he owns.  It's vacant, apparently.

18   But the information that's been provided to me is that if in

19   fact it has a value of what one county tax assessor has said

20   it's worth, then he would have a significant equity in the

21   home.

22             MR. LILLEY:  He would have no equity in that home,

23   Judge.  We can take any county assessor value, and if somebody

24   can sell that home for $500,000, the house next door was listed

25   at about 599 and sold for about 350.  That home is not worth

1  $500,000.  If he thought he could put that on the market and

2  get a $500,000 equity out of that home, we would do it.  He has

3  vacated that home.  It will go -- it will go into foreclosure

4  because he hasn't made a couple of months' payments.  The bank

5  will take it over.  He won't -- that house won't even be his.

6  It won't be his as soon as the bank doesn't get one or two more

7  payments and they foreclose on it.  The home won't be his.

8              THE COURT:  Okay.

9              MR. LILLEY:  Judge, a couple of things, Judge, and I

10 hate to belittle the point, but this PSR makes it look like

11 we're doing nothing to comply with Mr. Rodriguez's request.  On

12 number 85, he said he sent it to us February 1st.  I have a

13 copy of the email.  I received that email on February 9th.  At

14 the bottom of that paragraph 85 -- basically, we submitted all

15 of this financial stuff.  Then we received a new application

16 and said fill out the application.

17              Well, I never even thought to tell Mr. Haese, okay, we

18 completed this new application, now give me every, single

19 document for every single bill or everything you get in the

20 mail.  I never told him to do that.  You know, so we didn't --

21 so we're harped on.  We didn't submit -- we didn't submit

22 bills.  He doesn't have any bills.  He's been moving into his

23 mom's.  We did the best we could to estimate it.  We moved out

24 of the house.  We're moving into a home on his mom's property.

25 So the bottom of that, I didn't tell him to get any of that

1   information because really it is not available.

2          To continue, on February 24th, this is page 86 where

3   Mr. -- probation tells us that he asked us at that time to

4   verify Kim Loera's information.  I got that information from

5   February 20, whenever it is.  It does not have that request on

6   that.

7          When we met with probation when they toured his home,

8   probation asked Mr. Haese how much does Kim Loera make.  I'm

9   there.  He responded that she makes $3200 a month.  Nowhere in

10  this PSR is it reflected that we gave Mr. Rodriguez that

11  information, and yet throughout this plea agreement, it is

12  unverified.  We told him it was $3200 a month.

13         Did we get verification?  No, not at the end.  We

14  couldn't -- I couldn't get a pay stub.  Mr. Haese was e-mailing

15  me stuff.  I was trying to forward it to Mr. Rodriguez.

16  Sometimes he missed my e-mails; sometimes he did not.  I know

17  he's under a lot of stress in this case because there is a lot

18  of information, and he's doing the best he could.  But I would

19  send him an email. And I asked him, "Did you get it?"  He said

20  no.  He was having problems downloading things.  I had to

21  hand-deliver him some stuff at the last minute.

22         Down page 88, no documentation.  They want us to

23  provide documentation that the house is in foreclosure.  I told

24  probation there is no such document.  Just like when you don't

25  pay your car payment, and they just come and take your car.  Is

1    there a document that you're going to show that my car is

2    repo'd?  Not until it is repo'd.  Same thing with the

3    foreclosure.  More than once in this presentence report, we

4    didn't provide verification that this home is in foreclosure.

5    That's because they just send you a letter after first payment

6    saying you're --

7            THE COURT:  I know we're quibbling over who said what,

8    but do you want some corrections made in the Presentence

9    Report?

10            MR. LILLEY:  No, I don't want these corrections made.

11   I'm just saying when I read this presentence report, I was

12   losing my breath with the insinuation that we're not complying

13   with a bunch of this stuff.  It goes on and on and on.

14            Page, verification of bank records on his mortgage

15   payment.  I emailed that to him on March 7, 2012.  He said he

16   never got it.  Monthly payments of his two Chevrolet pickups.

17   I had emailed it on March 12th.

18            THE COURT:  Well, I'm a little unclear, Mr. Lilley, at

19   this point, what, if anything, you want me to do.

20            MR. LILLEY:  Judge, here is what I want the court to

21   recognize, that the tone of this PSR that we're not complying

22   with stuff is not accurate.  I'll move on with the substantive

23   part of our sentencing hearing.

24            THE COURT:  I think we need to get to what is really in

25   dispute here.

1          MR. LILLEY:  Yes, sir.

2          MR. SALTMAN:  Your Honor, if I may, before we move on,

3    Mr. Lilley has indicated that he has provided some of the

4    information that probation claims wasn't provided.  I would ask

5    Mr. Lilley to provide that information again now.  I think that

6    information is going to be important, and necessary, when the

7    court's trying to decide whether Mr. Haese, for instance, has

8    the financial ability to make a lump sum payment at this time.

9          THE COURT:  I'm getting the picture that he has no

10   assets.

11          MR. LILLEY:  He doesn't.  There is nothing.  These

12   things, the only information that we're providing is they know

13   everything.  He's got two vehicles, which he has little equity

14   in.  He's got no home.  He pays -- he lives on his mom's

15   property now, and pays the $700 mortgage on that which we

16   didn't provide a lease agreement between him and his mom.  That

17   was twice in the Presentence Report, getting on us for not

18   providing a lease agreement for him living on his mom's

19   property.  We don't have a lease agreement.

20          He's got nothing.  There is this information, the only

21   information really that I could provide him is a verification

22   that his girlfriend makes about $3200 -- brings home, I think,

23   $3200 a week.  A month, sorry.

24          THE COURT:  Well, I think there was also a request for

25   documentation of what Mr. Haese is earning now.

1            MR. LILLEY:  I did provide them with a letter also from

2    his employer.  The information, we told probation he works for

3    an exterminator.  He has not had any income since October of

4    last year because exterminators don't make money in the winter.

5    So we told probation we have had no check stubs since October,

6    so we couldn't even find a check stub.

7            We then provided probation, maybe they didn't get it

8    again, with a letter from his employer saying as of April 1st,

9    work starts again because bugs come back when it gets warm and

10   that he'll make approximately $800 to $1,000 a month

11   beginning -- a week, sorry, so roughly $3400, $3200 to $4,000 a

12   month beginning the first week in April.  I provided that to

13   probation.  I assume they got it.  I don't know, but it is not

14   reflected in the Presentence Report.

15           MR. RODRIGUEZ:  When did you send that, Jess?  Because

16   we have never received any of that.  We have also never

17   received any bank records.  We received copies of checks that

18   he had submitted, but when I talked to you, I spoke

19   specifically of those that we don't have bank records to verify

20   that those check copies that you provided were actually cashed

21   for the things that he's saying they were.  In other words,

22   they could have just been blank checks written out.  We don't

23   have any verification.  I'm not going to put in the PSR what

24   his girlfriend makes if we cannot verify any of that

25   information.  There is no check stubs.  There is no pay stubs,

1    nothing, in reference to what she makes.

2            MR. LILLEY:  Judge, I'm not going to sit here and argue

3    with probation.  If we're going to tell them something, they

4    put nonverified, half the presentence reports I get say not

5    verified.  We tell them she makes $3200 and put $3200 in there

6    and say not verified.  I'm not going to go back and forth with

7    probation.

8            THE COURT:  Let's get down to where the big disputes

9    are here.

10            MR. LILLEY:  All right, Judge.  First of all, with

11    regards to obstruction, the government has indicated that they

12    did not -- we are not going to pursue that.  Obviously, if --

13    as the PSR indicates, if they wanted to pursue it, they would

14    have the burden, and they have chosen not to do that, so that

15    takes us down to level 8, Criminal History Category I.

16            THE COURT:  Wait just a minute.  Let's look at the

17    Presentence Report and see where we're talking about this.

18            MR. LILLEY:  All right, Judge.

19            THE COURT:  Is this paragraph 54?

20            MR. LILLEY:  I'm trying to look for it now, Judge.

21    Yes, it is, Judge.

22            THE COURT:  What is the government's position on

23    obstruction of justice?

24            MR. SALTMAN:  The government is not pursuing that

25    enhancement, Your Honor.

1            THE COURT:  All right.  I'll eliminate the two levels

2    that were added for obstruction of justice in paragraph 54.

3            Now, what is the next dispute?

4            MR. LILLEY:  The next dispute, Judge, to back up, 52 is

5    the vulnerable victim adjustment.  That was an adjustment that

6    was not in the plea agreement probation identified.

7    Essentially, that's a vulnerable victim that both the

8    government and I have discussed at length, and I don't think

9    the law is in dispute, Judge, vulnerable victim, you can't

10   say --

11           THE COURT:  Let me get the government's position on it

12   first.  What is your position on vulnerable victim?

13           MR. SALTMAN:  That enhancement should apply, Your

14   Honor.  Would you like me to elaborate?

15           THE COURT:  What I would like for you to elaborate on

16   is why it was not addressed in the plea agreement.

17           MR. SALTMAN:  Your Honor, the plea agreement identified

18   two enhancements that would apply, but the plea agreement

19   never -- does not state that those are the only two

20   enhancements that apply.  Probation -- you know, basically,

21   what we did, when we went through possible enhancements, we

22   looked at enhancements that flow from the crime of conviction,

23   that would naturally flow from that crime of conviction, and

24   vulnerable victim wasn't one that we had identified in our

25   negotiations and before we entered into the plea agreement.

1    But probation, I think, wisely included it as an enhancement in

2    the Presentence Report, and our position is that it does apply.

3    It clearly applies.  And it should have been included in the

4    plea agreement.  However, the fact that it wasn't, Your Honor,

5    I don't think precludes this court, certainly, from applying

6    the two-level enhancement, because again, the plea agreement

7    does not state that the stipulations that were contemplated are

8    the only stipulations that will apply.

9         THE COURT:  Well, is it your position, Mr. Lilley, that

10    the plea agreement precludes anything other than what was

11    explicitly mentioned in the plea agreement?

12         MR. LILLEY:  Well, I wish I could say it did, Judge.  I

13    mean, you know, the plea agreement is just a standard plea

14    agreement.  It doesn't say -- sometimes it will say this

15    enhancement does not apply or this does apply.  I don't think I

16    can honestly represent to this court any plea agreement term

17    which would prohibit probation from identifying something.  I

18    don't think they are prohibited from identifying anything.

19         Obviously, you know, when we enter a plea, we have the

20    basis of the bargain, you know.  We enter it thinking this is

21    what we're facing, and probation does what their job is to do,

22    and it's to identify whatever they have.  I can't point to

23    anything in the plea agreement that says, well, now this is a

24    violation of the plea agreement because the government has

25    jumped on board with probation on a couple of enhancements.  I

1     guess the answer to your question is no, Judge.

2          THE COURT:  In going through the plea agreement, I

3     don't see anything in here that would limit the government or

4     probation to the stipulations set forth in the plea agreement.

5     This is not a Rule 11(c)(1)(C) agreement, is it?

6          MR. SALTMAN:  No, Your Honor, it is a (c)(1)(B)

7     agreement.

8          THE COURT:  Paragraph 5 kind of addresses the situation

9     here, I guess, which says, "Defendant understands and agrees

10    that sentencing is pursuant to the Sentencing Reform Act of

11    1984 and the United States Sentencing Guidelines which are in

12    effect advisory.  The court is required to consider the

13    applicable advisory sentencing guideline range in determining

14    the appropriate sentence notwithstanding such advisory

15    guidelines.  The defendant understands that no one can predict

16    with certainty what sentence the court would impose.  The

17    defendant fully understands that the determination of the

18    actual sentence imposed is solely in the discretion of the

19    court."  That's pretty broad language.

20         MR. LILLEY:  It is, Judge.  That's what I was referring

21    to when you first asked me the question.

22         THE COURT:  Well, it seems to me that the government

23    and probation are not prohibited under the terms of the plea

24    agreement from arguing that two levels should be added for

25    vulnerable victim under 3A1.1(b)(1) of the guidelines.

1          Is it your position that the evidence does not support

2     that?

3          MR. LILLEY:  It is, Judge.  The law is clear, they need

4     to show -- you can't just say these are a group of people with

5     Lyme disease; therefore, it is vulnerable.  Because especially

6     in a fraud case, fraud is by its nature deceiving or implying

7     or promising something that is not or misrepresenting a fact.

8     So the government cannot come in here and say these are all

9     Lyme disease patients and therefore vulnerable because they are

10    seeking the treatment and they want to get better and they want

11    this treatment and this was misrepresented to us.  They need to

12    show that -- they have to remove themselves just from that, and

13    they have to go one step further, that this is a specific class

14    of Lyme disease patients who are extraordinarily vulnerable for

15    some specific reason, and that 22 out of the 32 Lyme disease

16    people that they contacted fall into this specific category.

17         So I don't dispute the law or what the government has

18    indicated.  I just think what they said in their memorandum and

19    what they will say here today is just, hey, these people were

20    seeking treatment, they were represented that the success rate

21    is 100 percent, and never mind the release that they looked at

22    and signed; but, you know, they were preyed upon because they

23    are Lyme disease patients.  All Lyme disease patients are

24    looking for a cure, I would assume, so I would argue, Judge,

25    that that did not apply.

1                THE COURT:  Well, let me ask Mr. Saltman, where is the

2       evidence that supports this?  I guess that's what I need to

3       ask.

4                MR. SALTMAN:  Okay, Your Honor.  First of all, I take

5       issue with the representation that government needs to prove

6       that all 22 people that have been identified or that have come

7       forward with compensable loss are vulnerable victims.  I think

8       guidelines are pretty clear, and the case law is pretty clear,

9       that the government only need prove that one of the victims is

10      a vulnerable victim.  Notwithstanding that, all of the victims

11      in this case are vulnerable, and here is why, Your Honor.

12               First of all, to understand why these particular Lyme

13      disease victims are vulnerable, you need to understand a little

14      something about Lyme disease.  It is not something that people

15      in New Mexico are necessarily familiar with, because it is a

16      tick-borne illness, and these ticks basically come from deer.

17      We don't have a lot of deer here in New Mexico.  It is

18      something you might see mostly in the midwest.  But like I

19      said, it is a tick-borne illness, and it is transmitted from a

20      tick bite, and often, that tick bite is painless, and the

21      people that are bitten often don't know they are bitten and

22      often don't know they are infected with Lyme disease.  Because

23      of that, you know, the disease festers in the body, and it goes

24      undiagnosed, and it goes untreated.

25               And the victims in this case, Your Honor, were all

1   chronic Lyme disease sufferers, people that had the disease for

2   years and years and years.  And then, when they were finally

3   diagnosed, these people sought treatment but to no avail.  If

4   it is detected early, it can be treated successfully with

5   antibiotics; but the victims in this case weren't able to have

6   their Lyme disease treated and cured early on, so they suffer

7   with the disease for years and years.  And what that means,

8   Your Honor, is that these people suffered migraines, dizziness,

9   brain fog, poor memory, poor sleep, lack of verbal fluency,

10  confusion, disorientation, decreased ability to concentrate,

11  facial nerve ticks, paralysis, sore jaw, difficulty chewing and

12  swallowing, muscle twitches, symptoms that are consistent with

13  350 other diseases out there.

14          And these people were at their wit's end and were

15  seeking treatment for this debilitating disease, and when I say

16  "they," most of them.  And if we want to put a name to their

17  faces, Cheryl Fidler, for instance, or Todd Stockton or Carol

18  Munson or Dan Munson, did their research, got on the Internet

19  and tried to find a cure for their Lyme disease, and through

20  their Internet search learned about a doctor in the Southwest

21  who purportedly had treated 3,000 people for this disease,

22  which again has no known cure outside of being treated early

23  with antibiotics, and no vaccine.  But they had learned of this

24  purported doctor in southern New Mexico who had treated and

25  cured 3,000 people of this disease.  So that's the kind of

1  people that contacted the defendant.  And there were symptoms

2  and the fact that they had lived with this disease for years

3  and years and years and years without a cure, without hope,

4  makes them vulnerable victims under the guideline, Your Honor.

5           THE COURT:  Well, where is all of the evidence

6  supporting what you have just said about people with Lyme

7  disease?

8           MR. SALTMAN:  Well, Your Honor, it is contained, I

9  believe, in the government's response, and I believe at the

10  last hearing, the sentencing hearing which was continued, if

11  the court remembers, the government was going to put on

12  evidence of all of this, and Mr. Lilley agreed and stipulated

13  to the factual allegations set forth in the government's

14  sentencing memorandum.

15           THE COURT:  Okay.  Is that correct, Mr. Lilley?

16           MR. LILLEY:  Judge, what it is is that when they filed

17  their response to my sentencing memorandum, there was a bunch

18  of attachments, about 60 or 70 pages worth of attachments.

19  What they were going to do is call the agent who conducted some

20  of those interviews, most of them in December, a month before

21  the sentencing, to testify that's what these people were going

22  to say.  I did stipulate to, no, we did not need to call

23  Mr. Stockton to testify about what these people were going to

24  say, that I would stipulate that he would testify to what was

25  in essentially his reports.  So, yes, I did stipulate that we

1    did not need the agent to go through all of those exhibits at

2    sentencing.

3           THE COURT:  Well, help me out.  Do the exhibits reflect

4    and support what Mr. Saltman just said about --

5           MR. LILLEY:  Without going through every one of them,

6    Judge, they don't support his recitation of exactly what Lyme

7    disease is, and we dispute all of that, but the fact that his

8    recitation that some of these people they have identified as

9    victims were seeking treatment and they had a bunch of symptoms

10   and they researched it and located -- some of them might have

11   located Mr. Haese through the Internet, yes, Judge, I agree

12   that's some of what is presented here.

13          THE COURT:  What I'm trying to look at is what shows

14   the vulnerability of the victims, and I can understand an

15   argument to the effect that people who have been infected for

16   years and have not been able to get relief from whatever

17   treatment they received may be desperate and would look at

18   anything in hopes of getting treatment.  In that sense, they

19   may be vulnerable, but where is the evidence of that in the

20   record?  That's what I'm asking for.

21          MR. SALTMAN:  If the court would give me a minute, we

22   filed a pretty lengthy memorandum in this case, and we're going

23   through it right now.

24          THE COURT:  I'm looking at page 38 of 46.

25          MR. SALTMAN:  I believe the information that the

1    court's looking for, the information in the sentencing

2    memorandum that might articulate exactly why some of these

3    victims are vulnerable, is contained right where the court is

4    looking beginning on page 37 and continuing through page 46

5    where it contains a description, a brief description, of the

6    victims that we've identified, and how they came into contact

7    with the defendant and what brought them, what caused them to

8    seek out the defendant for this treatment.

9             Admittedly, the -- you know, these descriptions aren't

10   as detailed as what I'm representing Lyme disease to be, but I

11   think it is clear -- I mean, if you look at, for instance, on

12   page 38 where it references Kathleen and James Hallman, it

13   states -- I'll just read it:  "Kathleen Hallman contacted

14   defendant by telephone in 2008 because she was very sick and

15   had seen a naturopathic doctor in Oregon who thought she had

16   Lyme disease.  During the conversation, defendant told Hallman

17   that the defendant's father was an expert on diseases involving

18   parasites, that he had contracted Lyme disease from tick bites

19   while living in Florida, and that his father developed a

20   formula which cured him of the disease, that her family could

21   be at risk of contracting the disease because Lyme disease is

22   communicable, and that Hallman's pregnant daughter, Stephanie

23   Anderson, was at risk of contracting Lyme disease and passing

24   it on to her unborn child."

25             THE COURT:  Well, these may be fraudulent statements.

1    I'm not sure how it makes Ms. Hallman vulnerable.

2         MR. SALTMAN:  Well, Jennifer Schuets, November 2005,

3    diagnosed with Lyme disease by a doctor, still had the disease

4    when she contacted the defendant in 2008.  I mean, these are

5    all people that have -- who were previously diagnosed with Lyme

6    disease, Your Honor, had the disease for three years, were

7    obviously still suffering from the disease, and sought out

8    treatment from a doctor.  Yeah, to be cured of the disease.  I

9    think that makes them vulnerable victims under the guidelines.

10         MR. RODRIGUEZ:  Your Honor, if I may add something for

11   clarification, the guideline for victim, vulnerable victim,

12   basically is applied if the defendant knew or should have known

13   that the victim of the offense is a vulnerable victim.  We do

14   not have a certain section that classifies all who are

15   vulnerable.  It is simply if the defendant knew that the victim

16   was a vulnerable person.

17         In this particular situation, after they had attempted

18   natural medicine and received no results for Lyme cure, they

19   did their research, contacted Mr. Haese.  The issue is that in

20   representing himself of the fact that he had a cure for

21   something that nobody else has, even though they didn't have a

22   cure themselves through natural medicine, made them vulnerable.

23   In other words, he knew they were vulnerable victims, or he

24   should have known.  Obviously, if he had been in the business

25   of providing the services, he knew that there was no other

1    options, and by basically speaking to them as Mr. Saltman

2    stated, one of the victims claims that he said that he had a

3    cure for Lyme disease.  So the application is applied because

4    of the simple fact that he knew or should have known that these

5    individuals with the Lyme disease were vulnerable victims.

6              THE COURT:  Mr. Lilley, do you want to respond to that?

7              MR. LILLEY:  Well, Judge, right.  3A1.1(b)(1), at the

8    very last sentence that's actually cited by the government on

9    page 16 of 46 at the end, it is not enough that the victim

10   belongs to a class generally considered vulnerable.  So

11   vulnerability can't -- someone being vulnerable and then a

12   crime committed because they are vulnerable is not enough.  We

13   can't just say these are a -- we're saying this is a group of

14   people who have Lyme disease and therefore they are vulnerable,

15   and then therefore they are subject to fraud because they are

16   vulnerable.  That doesn't meet the standard.

17             The standard is that they have -- you can't just

18   identify a class of Lyme disease patients, and I think what the

19   court was indicating when it was asking the government about

20   some specifics to require specific vulnerability, it is not

21   there.  I understand what probation says, but I think once you

22   evaluate it, interpret it, you can't just say this one patient

23   has Lyme disease and they called Mr. Haese and so therefore

24   they are vulnerable.  That's exactly what's prohibited.

25             THE COURT:  Well, probation is indicating a step

1    further, that he's misrepresenting things to them, but it seems

2    to me that there needs to be some evidence backing up what

3    Mr. Saltman said, and from my knowledge of persons who have

4    Lyme disease, I would have to agree with what you say, but I

5    can't consider that in my personal life.

6         MR. SALTMAN:  Well, Your Honor, I don't think there is

7    any dispute that the 22 victims that we've identified are Lyme

8    disease sufferers.  That fact alone makes them particularly

9    vulnerable to the defendant's false representations, because

10   he's holding himself out to be a naturopathic doctor who has

11   developed a world super protocol to cure the Lyme disease.

12        THE COURT:  Which is fraudulent in your view.

13        MR. SALTMAN:  Not only is it fraudulent, Your Honor,

14   but it's a fraud that is delivered to people who are

15   particularly susceptible to the fraud.  It is not like he's

16   making this representation --

17        THE COURT:  That's why I need to know where the

18   evidence is.  What is the evidence that these are people who

19   are particularly susceptible to the fraud other than the fact

20   that they have Lyme disease and have not found a cure of it

21   yet?

22        MR. SALTMAN:  Well, I would suggest to the court that

23   that's enough, that we've got 22 people who have Lyme disease

24   who have not been able to find a cure for their Lyme disease

25   and who have been suffering from the disease for years.  And I

1   think the evidence of that is in the summaries of each one of

2   the 22 victims contained in the government's sentencing

3   memorandum.  I understand that that's just in the sentencing

4   memorandum, but Mr. Lilley has stipulated that those factual

5   allegations are true.

6        We were prepared to put the case agent on the stand who

7   personally interviewed each one of these victims and took

8   statements from them, but counsel has agreed that the

9   government doesn't need to put that witness on the stand and

10  testify to that, so I would rest on what's contained in the

11  sentencing memorandum.

12       THE COURT:  Is there something in there that says, "I,

13  patient A, was desperate, and that's the reason I went to

14  Dr. Haese"?

15       MR. SALTMAN:  Yeah, I'm sure there is, Your Honor.  If

16  you want to give me a couple of minutes, I could find it.

17       THE COURT:  Well, this promised less-than-30-minute

18  hearing is going on and on and on.

19       MR. LILLEY:  Just with regard to what Mr. Saltman --

20  he's taking my stipulation the agent would get up here and

21  testify to what those people said as I stipulated that those

22  factual allegations are true.  That's a little bit -- that's

23  extending my stipulation to say somebody is going to get up and

24  say, "Here is what all of these people told me."  They didn't

25  ever tell me they were going to bring in 20 people and I'm

1    going to stipulate to what those 20 people said.  They said,

2    "We're going to bring in the agent.  He's going to testify 'all

3    of these people told me this.'"  I said, "Great, I'll stipulate

4    that the agent is going to say 'all of these people told me

5    this.'"  Counsel represented to the court that I stipulated

6    that all of those factual allegations are true.  That's a

7    little different.

8         THE COURT:  In a hearing like this, I can accept

9    hearsay evidence, so --

10         MR. LILLEY:  For the record, Judge, I wanted to clear

11   that up, that I didn't stipulate everything in there is true.

12   I stipulated that that's what the testimony would be.

13         Judge, I don't know -- I've got a couple of other

14   things.  Also, I've been -- while they are looking it up, you

15   have to look at everything in context, Judge, and we haven't

16   really gotten to there is a release in this case which every

17   one of these people signed which is not this four or five page

18   release in small type.  I've attached it as Exhibit 5.  It

19   clearly states in plain English, not in legalese, that all of

20   this treatment, there is no guarantee, et cetera.

21         Also, at the last hearing, the court also received into

22   evidence a recorded call.  Once the agent in this case got some

23   reports, they then made an undercover call posing as a Lyme

24   disease patient to Mr. Haese, and I don't know if the court has

25   had the chance to review that, but what it did is there was no

1    promise of any specific outcome.  It was actually told to the

2    agent that he does treat a lot of patients and they have had

3    success, that he did treat over 3,000 patients.  He did not

4    represent that he was -- he didn't say he's board certified, he

5    doesn't have any degrees that are accredited in the United

6    States, and that was an undercover call.

7         So the undercover agent who was attempting to elicit

8    some promises from Mr. Haese with Mr. Haese not knowing that

9    there is an investigation, didn't receive really any of the

10   promises that are almost depicted in every single one of the

11   representations from the people who are listed as victims,

12   seven or eight who originally, as the court can see in our

13   Exhibit 7 or 8, who had signed a letter saying, "I had

14   treatment, there was no problem with it."

15        The other thing is Mr. Haese doesn't advertise at all.

16   I think the vulnerable victim situation is if I'm advertising I

17   cure cancer or I cure Lyme disease or I cure broken legs, then

18   you're advertising, you're catering to people.  That's not

19   something we have.  I think those two facts also go into the

20   vulnerable victim analysis.

21        THE COURT:  Mr. Saltman?

22        MR. SALTMAN:  Your Honor, the government's supplemental

23   response, which is document 60, filed on March 6, 2012, Cheryl

24   Fidler, the supplemental response states that Mrs. Fidler was

25   diagnosed with Lyme disease in 2003 and sought treatment for

1    the disease but her condition did not improve.  She then heard

2    about defendant and sought treatment at the Haese clinic.  She

3    is part and parcel, Your Honor, of every victim in this case.

4    People that have been suffering from Lyme disease for multiple

5    years without success who have learned about somebody in the

6    Southwest that can cure it with a 100 percent success rate.

7    That's what makes Ms. Fidler and all of these 22 victims

8    vulnerable.

9            But even that said, Your Honor, I think to receive the

10   two-level enhancement here, all the government's required to

11   show is that the defendant has targeted through this fraud a

12   particular class of people who are vulnerable because of their

13   particular circumstances, and that's what we've got here, Your

14   Honor.  We've got a defendant who has targeted a particular

15   class of people, people who are suffering from Lyme disease,

16   people who are vulnerable, people who are desperate for a

17   treatment, who are desperate for a cure, and that, Your Honor,

18   is why the enhancement should apply.

19           Again, if the court disagrees with that, I think the

20   government has shown through Cheryl Fidler, at least, that she

21   in particular was vulnerable, she had been suffering from the

22   disease for years who sought treatment without success, and was

23   now reaching out to somebody who could guarantee her a

24   successful treatment.

25           THE COURT:  I think Ms. Fidler's July 2, 2002 letter,

1    Exhibit 14 attached to the government's supplemental response,

2    can fairly be read to mean that she was a vulnerable victim.  I

3    think her situation at least was analogous to application note

4    2 regarding section B which says that the adjustment would

5    apply, for example, in a fraud case in which the defendant

6    marketed an effective cancer cure.  I think it is closely

7    analogous to that, so I think that there is evidentiary support

8    from the record for that enhancement and I will approve that

9              Now, what is the next area of dispute?

10             MR. LILLEY:  Judge, I'm not going to argue.  I would

11   just point out Exhibit 48-7, it is a letter from Ms. Fidler who

12   indicated that she had successful treatment before the

13   litigation started in this case, and before she was contacted

14   in December of 2011, had no problems with the services that

15   Mr. Haese provided her.

16             The next is abuse of trust, Judge, and that is in -- I

17   got lost here.

18             THE COURT:  That's paragraph 53.

19             MR. LILLEY:  Yes, sir.  Paragraph 53.  I don't think

20   there is -- the same argument would be duplicating.  One, they

21   need to show that there is a position of trust, and the trust

22   was used significantly to advance the scheme.  As even noted in

23   the government's response, every fraud case, there is a level

24   of trust, and so again, this is not -- these people show up;

25   they are not marketed.  The court cited the note about

1    marketing these people.  There is -- all of this is

2    word-of-mouth.  All of these people will tell you that they

3    received -- they were referred by word-of-mouth, by other

4    people who have received treatment, so there was no marketing

5    of any of these people.

6          THE COURT:  I think when they contacted Dr. Haese, he

7    said that he had such a record of success, and that that in

8    effect is marketing to them in person.

9          MR. LILLEY:  Well, Judge, I mean, if you look at the

10   letter that she wrote before there was litigation, before she

11   got her restitution letter, and she had no complaints

12   whatsoever about the treatment, I think the court has to

13   evaluate the basis for that.  If I go to a doctor, and I'm okay

14   with the treatment, and I don't complain, and somebody contacts

15   me and says can you write a letter, and I say sure, and I write

16   a letter on his behalf, then I get a restitution letter later

17   that doesn't say anything about you receiving bad treatment and

18   then I can get $10,000 back...

19         THE COURT:  Well, Mr. Saltman, do you want to respond

20   to that?

21         MR. SALTMAN:  Sure.  First of all, I disagree with

22   Mr. Lilley's assertion that every fraud involves some sort of

23   abuse of trust.  When somebody buys a birth certificate in

24   Juarez, Mexico, for $10 and then shows it to an INS inspector

25   at the border, that's not an abuse of a position of trust.

1    This clearly is, Your Honor.  We've got somebody that's holding

2    themselves out to be a naturopathic doctor.  Not just a

3    naturopathic doctor, but no less than Carl E. Haese, NMD, ND,

4    DNM, OSJ Knight of Honor, Integrative and Orthomolecular

5    Medicine.  Somebody, when you go to visit them, resides in a

6    clinic or works in a clinic with Haese Clinic of Integrative

7    Medicine written on the door, and somebody who represents to

8    the people that call them that he's codeveloped this world

9    secret protocol to treat Lyme disease patients, and he's

10   treated them with a 100 percent success rate, you know, holding

11   oneself out as a doctor even when you're not is one thing, but

12   holding yourself out as a doctor who purports to have a

13   cure-all for a debilitating disease to people who have been

14   suffering from the disease for years and years without

15   successful treatment, Your Honor, is clearly an abuse of trust,

16   and that enhancement clearly applies.

17            MR. LILLEY:  The court should listen to that recording.

18   This agent calls him and purports to be a Lyme disease patient

19   and trying to elicit all of this good stuff of all of these

20   people that say this stuff after getting the restitution

21   letter, most of them, and none of this stuff is in there.

22   There is no 100 percent cure ratio in there.  It is just --

23   there is not even -- it is not -- there is none of that stuff.

24   That should speak volumes in this case, what is in that

25   recorded phone call.

1          MR. SALTMAN:  Is the recorded phone call in evidence?

2          MR. LILLEY:  I would think you entered it last time.

3          MR. SALTMAN:  I'm not clear if I entered that phone

4     call in evidence, Your Honor.  I don't have it with me, but I

5     think what Mr. Lilley is referring to is a recorded phone call

6     between the case agent, Todd Blair, in an undercover capacity

7     to the defendant, and we -- perhaps we could stipulate to the

8     phone call's admission, and I could provide it to the court,

9     but I can tell the court the sort of things that Mr. Haese said

10    to the undercover agent during that phone call.

11          He talked to him about a Lyme disease protocol that

12    lasted -- that could last seven days.  He told Mr. Haese -- I'm

13    sorry, Mr. Haese told the undercover agent that 45 percent of

14    the people that receive the treatment experienced a feeling

15    like being drunk or stoned, euphoric, that he treated 3,000

16    people in the last five years, that he "didn't have a failure

17    to date."  That all patients have significantly benefited, that

18    most people -- that for most people, it completely turns their

19    life around, and they go back to being the people they were

20    before the disease.  That he had had people come to his clinic

21    in a wheelchair and walk out after receiving the disease.  That

22    his Lyme disease treatment was the specialty of the house over

23    there at the Haese Clinic.  That he himself had suffered from

24    Lyme disease and he had codeveloped the Lyme disease protocol

25    with Dr. Bradford and Dr. Allen.

1          Those are the sort of representations that Mr. Haese

2    made to the undercover agent in this case contained on the call

3    that I'll move into evidence now and provide to the court after

4    the hearing, and these are the same representations that the

5    defendant made to all of the victims that he spoke to in this

6    case.

7          And, Your Honor, the defendant admitted as much, not in

8    as much detail, in the plea agreement, paragraph 7, defendant's

9    admission, where he says that he told one victim, Todd

10   Stockton, that he had a treatment protocol for Lyme disease and

11   that he had a 100 percent success rate for everybody that he

12   treated.  And he admits that his representation that he had a

13   100 percent success rate where everybody he treated was false,

14   and in fact that his treatments had produced varying results.

15   So not only is it something he told to an undercover agent in a

16   recorded telephone call, not only is it something that he

17   admitted to telling Todd Stockton in his plea agreement, but it

18   is also something that he told to every one of other victims in

19   this case.

20         THE COURT:  Do you have any cases that come close to

21   this?

22         MR. SALTMAN:  I'm sorry, Your Honor, any case law?

23         THE COURT:  Yes.

24         MR. SALTMAN:  I'm sure we do, Your Honor.  I would have

25   to find the cites in the government's sentencing memorandum.

1          THE COURT:  What is the closest we get in the

2   application notes?  There is a reference in Note 3(b) that says

3   perpetrates a fraud by representing falsely to a patient that

4   defendant is a licensed physician.  What else do we have about

5   physicians and patients?

6          MR. SALTMAN:  I'm not seeing anything right now

7   directly on point in the application notes, but if the court

8   will indulge me for just a moment.  I know -- I believe we

9   cited several cases in support of this enhancement, Your Honor.

10  One of them is United States v. Chee.

11         THE COURT:  What page are you on?

12         MR. SALTMAN:  On page 18 of the government's sentencing

13  memorandum.

14         THE COURT:  Well, that's pretty extreme.  Sexual abuse

15  of a woman suffering seizures and partial paralysis, that's

16  mental retardation.

17         MR. SALTMAN:  On page 19, Your Honor, there is a

18  parenthetical that discusses the case, and I don't know if this

19  is exactly on point either, but in that case, in the Chee case,

20  the defendant was found to have abused his position of trust as

21  a medicine man.  He used "his professional discretion to

22  facilitate and conceal his offense even though he was not

23  purporting to perform a medicine man's ceremony when he

24  sexually assaulted the victim.  So that was notwithstanding --

25  I don't know if -- what we have here, Your Honor, is we've got

1    somebody who not only is holding himself out as somebody that

2    he's not, somebody who has codeveloped a world secret protocol

3    for Lyme disease and successfully treated 3,000 people, but

4    we've got somebody who, because of those representations, was

5    able to induce people to come to his clinic and receive the

6    treatment.

7            MR. LILLEY:  If I may, Judge.

8            THE COURT:  Go ahead.

9            MR. LILLEY:  Part of what Mr. Saltman didn't recite to

10    the court is actually in his memorandum on page 10, also

11    Mr. Haese tells the undercover agent he's not board certified

12    in naturopathic in New Mexico, the United States does not

13    recognize any of his degrees that he obtained.  They are not

14    from any accredited schools or recognized by the AMA.  That was

15    represented to the agent who was an undercover Lyme disease

16    patient.

17            MR. SALTMAN:  Your Honor, if I may, I think Application

18    Note 1 is also helpful under 3B1.3 in that it defines private

19    or public trust.  What it says is that "public or private trust

20    refers to a position of public or private trust characterized

21    by professional or managerial discretion, i.e., substantial

22    discretionary judgment that is ordinarily given considerable

23    deference."  When you've got somebody like the defendant who is

24    holding himself out like he did and analyzing people's blood

25    under, you know, a big microscope that he calls the Bradford

1    Microscope, and telling people that they have Lyme disease, and

2    then recommending in his discretion either a five, seven- or

3    nine-day treatment at a cost in excess of $5,000, I think you

4    clearly have got an abuse of private trust.

5            Not only that, Your Honor.  I'll have to look through

6    the sentencing memorandum again, but there were also people,

7    victims, that received additional treatments.  In other words,

8    they didn't just receive the initial 5-, 7- or 9-day treatment

9    because in the defendant's discretion and professional opinion

10   the initial treatments did not work, and those additional

11   victims came back for subsequent treatments at an additional

12   cost of about $5,000.

13           So clearly, Your Honor, we've got somebody who is

14   holding himself out as an expert, who is holding himself out as

15   in fact the only person in the world who has this treatment,

16   and you've got people that are relying on that and showing

17   deference to him and to his representations in agreeing to

18   receive the treatment, and not just once, but in some cases

19   twice.

20           THE COURT:  Well, what is the significance of this

21   sentence in 3B1.3 that says, "This adjustment may not be

22   employed if an abuse of trust or skill is included in the base

23   offense level"?  Is it included in any way in the base offense

24   level or in the specific offense characteristic?

25           MR. RODRIGUEZ:  No, Your Honor.

1          THE COURT:  It is not?

2          MR. RODRIGUEZ:  No, this is -- it is not included in

3    the base offense level.  This was an adjustment basically of

4    the guideline by itself.  Just for clarification, what is

5    different from this case, the special skill that he possessed

6    was the fact that he had a cure for Lyme disease, and he -- if

7    he uses that special skill to facilitate the offense itself, in

8    this case, he used his special skill of the cure for Lyme

9    disease to fraudulently obtain services for these individuals,

10   and that's why this was applied.

11         THE COURT:  Okay.  What's your response to that,

12   Mr. Lilley?

13         MR. LILLEY:  Judge, my response to that is in U.S. v.

14   Koehn 74 F.3d 199, Tenth Circuit, every fraud case, there is

15   trust, so do these people -- I mean, when you go to a doctor,

16   just -- let's narrow it down to common sense.  When you go to a

17   doctor, you have trust in --

18         THE COURT:  What about the representation that he had a

19   special skill to treat and cure Lyme disease?

20         MR. LILLEY:  I don't know.  Not all of these people say

21   he had special -- that he could cure Lyme disease.  I know some

22   of them after the fact said initially -- again, we're talking a

23   bunch of people who wrote these letters saying "we have no

24   problem."  Now they have a problem.  Let's just say, and we

25   don't agree that he ever told anybody he had a cure, but we

1    admitted to and what's in his acceptance statement is he

2    represented that I have a "100 percent success rate." We

3    never -- we didn't say we have a cure.  A 100 percent success

4    rate is like he told Todd Stockton, everybody here has

5    sufficient -- everybody here has a significant benefit.

6            THE COURT:  Do you admit that he told the patients that

7    he had a special ability to treat their Lyme disease?

8            MR. LILLEY:  He -- the patients would ask him, he would

9    tell them about the Bradford Microscope.  Now, when you ask

10   these patients two years later or three years later, okay,

11   yeah, he represented he had a microscope.  It's not something

12   he developed.  This is something that his father used for

13   several years, multiple years.

14           THE COURT:  Well, did he represent in some fashion that

15   this was a special skill that he had with this particular

16   microscope to treat Lyme disease?

17           MR. LILLEY:  I don't think so, Judge.

18           THE COURT:  What is your position on that, Mr. Saltman?

19           MR. LILLEY:  I didn't stipulate to that.

20           THE COURT:  Well --

21           MR. SALTMAN:  That he analyzed all of these victims's

22   blood under this machine that he called the Bradford

23   Microscope, and that after he analyzed their blood, he said,

24   "You've got Lyme disease, and you need a 5, a 7 or a 9-day

25   treatment and here is how much it costs.  And what do you want

1    to do?"  So the government's position is that he used the

2    Bradford Microscope as a tool.  It purportedly diagnosed or

3    confirmed previous diagnoses of Lyme disease.

4           But again, Your Honor, that isn't necessarily the abuse

5    of trust that I'm talking about today.  What I'm talking about

6    is the defendant's representations that he had the secret, I

7    mean, he was keeper of the secret, he wasn't going to share it,

8    and if they -- if somebody wanted to be cured of Lyme disease

9    forever and return to their normal lives before they contracted

10   the disease, he was the guy that could do it.

11          THE COURT:  Is there evidence that he said that in the

12   record?

13          MR. SALTMAN:  Well, Your Honor, he admitted it in his

14   plea agreement when he told Todd Stockton that he had a

15   treatment protocol for Lyme disease and that he had a 100

16   percent success rate for everybody he treated, and that's not

17   true, and he admits that that's not true.

18          MR. RODRIGUEZ:  That's the only thing I was going to

19   add, Your Honor.  It is in his acceptance of responsibility

20   that he stated that had 100 percent to Mr. Stockton.

21          THE COURT:  Well, 3B1.3 is in the disjunctive.  It

22   says, "F the defendant abused a position of private trust or

23   used a special skill in a manner that significantly facilitated

24   the commission or concealment of the offense, increase by two

25   levels."  I think there is adequate evidentiary support on

1    either side of that "or" that he abused the private trust as a

2    physician and used a special skill in convincing patients that

3    his microscope and other forms of diagnosis and treatment would

4    likely result in their cure from Lyme disease.  So I will

5    approve the two level enhancement for 3B1.3.

6            Where are we now?

7            MR. LILLEY:  Judge, I think that's the only -- I just

8    have my sentencing argument.  I think that's the only.

9            THE COURT:  Well, let's take a look at the Presentence

10   Report on page 21, the adjusted offense level now becomes 21

11   instead of 23.  Is that correct?

12           MR. LILLEY:  It goes from down from 20 to 18 is where

13   it goes.  That 20 already included all the adjustment, and it

14   included the obstruction adjustment which the --

15           THE COURT:  I'm talking about paragraph 55, the

16   adjusted offense level.

17           MR. LILLEY:  Right.  Oh, I'm sorry, Judge, that would

18   be 21.

19           THE COURT:  21?

20           MR. LILLEY:  Yes, sir.

21           THE COURT:  Okay.  Then three levels are subtracted for

22   acceptance, and so the total offense level becomes 18.  Is that

23   correct?

24           MR. LILLEY:  Based upon the court's ruling, yes, sir.

25           THE COURT:  Are you in agreement that the Criminal

1   History Category is I?

2            MR. LILLEY:  Yes, sir.

3            THE COURT:  Do you agree that the guideline

4   imprisonment range then is 27 to 33 months?

5            MR. LILLEY:  Yes, I do, based upon the court's ruling.

6            THE COURT:  It would be my intent to impose a sentence

7   at the bottom of the guideline range.

8            Go ahead, Mr. Lilley, if you would like to make a

9   statement.

10           MR. LILLEY:  Judge, this is -- I'm not going to try to

11  rehash anything that I've already said.  This is not something

12  he developed.  This is not some treatment that he started.

13  This is a treatment that his father had been doing for many,

14  many years, and that was working.  His father passed away in

15  2008.  He continued this treatment.  Did he improperly

16  represent that he had 100 percent, not a cure rate, 100 percent

17  success rate with every person?  That's what we pled to, and

18  that's what he regrets doing.

19           Since this is a treatment that he underwent himself, we

20  had another physician, Dr. Haire, who was actually at the

21  facility, actually -- I enclosed all of the records in my

22  exhibit, treated and ordered the treatment for many of these

23  people.  He doesn't advertise.  He tells anybody who would

24  call, and I think that's also in the recording to the

25  undercover agent, anybody that would call, "I can give you

1    people's names."  This is by word-of-mouth.

2          Really from the very outset, this isn't just a

3    treatment that he's given people and he's sucking people in, he

4    would be advertising.  And if people were not satisfied, and

5    they were coming back to him and saying, "I'm not satisfied,

6    I'm not satisfied," if all of them weren't satisfied, he

7    wouldn't be giving people's names out.

8          Obviously, this does provide a benefit to a lot of

9    people.  There was 22 people.  32 responded, 10 people didn't

10   respond, and about nine of those people who responded had

11   written a letter saying there were no problems.

12         He has since sold the business.  That was his choice.

13   Obviously, his financial situation has gone downhill.  He lives

14   very modestly in a home, and which probation saw, he just moved

15   into on his mother's property.  I mean, obviously, we have had

16   to -- we've agreed to the restitution amount.

17         Because we don't have a lot of money, we couldn't come

18   in here and say here is 50,000, here is 100,000.  We don't have

19   the money.  We're just going to default on a loan if we

20   borrowed the money.  He's agreed to pay the money back.  He

21   will pay the money back.

22         THE COURT:  How is he going to pay the money back?

23         MR. LILLEY:  Well, here is the situation, Judge.  If

24   you don't put him in jail, and you put him on probation, or you

25   put him in a halfway house, one, he's going to continue to

1    work.  He's got a job right now that's going to make $4,000 a

2    month.  If he's not in custody, then he can take a loan out on

3    some property.  You don't want to take a loan out on property

4    if you know you're going to have to default.  So there is a lot

5    of situations.  The property that he lives on now --

6              THE COURT:  That's his mother's property.

7              MR. LILLEY:  It is not his mother's property.

8              THE COURT:  Whose is it?

9              MR. LILLEY:  It is his mother's property.  It is not

10   his property, correct, but it is a whole lot easier to take a

11   loan out or to pay off a loan if you're not going to default

12   right away.

13             What I'm getting at, Judge, if he serves any

14   significant incarceration at all, his ability to pay is going

15   to go downhill drastically.  One, obviously, when you do time

16   and you become a felon, the job market closes very quickly on

17   you.

18             THE COURT:  What asset does he have where he can even

19   consider getting a loan?

20             MR. LILLEY:  He's got his mother's property.  What he

21   didn't --

22             THE COURT:  You mean his mother is going to put up her

23   property for a loan to him?

24             MR. LILLEY:  Absolutely, Judge.  Absolutely.  We just

25   didn't want to come in here and put up this property right now

1    and come in with a $75,000 loan, and then the court

2    incarcerates him, and then they default on that loan because

3    they can't pay it.  His mom is on a fixed income.  So, yes, I

4    think we would.  He's going to have to pay it one way or the

5    other.  I mean, the court's going to order it.  We agreed upon

6    it.  Is it going to get paid?  The chances of it getting paid

7    are --

8            THE COURT:  Well, this is the first I've heard the

9    mother would put up her property in order to get it paid.

10           MR. LILLEY:  That's what I represented to the court the

11   last time, that we were looking at some property to put up.  I

12   didn't specifically refer to it as the mother's property.  When

13   we sat down and discussed it with Mr. Haese, it didn't make

14   financial sense to borrow a bunch of money on the property in

15   advance and then go to prison and then have that loan

16   foreclosed on.

17           THE COURT:  Let me state on the record, I don't think I

18   have done this yet, that based on the information that

19   Mr. Haese provided at his change of plea hearing and the

20   information in his Presentence Report, it is my finding that

21   the defendant, Carl Emanuel Haese, knowingly, voluntarily and

22   intelligently, entered a plea of guilty to the charge in

23   Information 2010-130, and at this time, I will accept both his

24   plea agreement and his plea of guilty.

25           Let me ask Mr. Haese, is there anything you would like

1    to say at this time, sir?

2         MR. HAESE:  Yes, Your Honor.  One, I would like to

3    apologize to the court, and I would apologize to Mr. Todd

4    Stockton in this case for misrepresenting the success rate that

5    I have, but I would like to stand adamant in saying that I feel

6    the prosecution has painted a very large, misrepresented --

7    misrepresented picture of me.  I have never in my lifetime

8    promised or guaranteed a cure for a disease.  I said that I had

9    a 100 percent success rate.  Every patient that came through

10   the office expressed to me and to the other staff members that

11   they had a significant improvement in their health and in how

12   they felt, even in the audio recording from the agent, I was

13   adamant in that phone call that there is no cure for this

14   disease.

15        I did not intentionally defraud people by telling them

16   that I could cure them and that I was the only person that ever

17   had this information as prosecution represented.  This

18   treatment that I offered them was nationally published in the

19   Townsend letter.  This treatment protocol was invented by

20   Dr. Bradford, and my father assisted, and I assisted in the

21   formulation of putting it all together.

22        I have never offered anyone a cure, Your Honor.  I

23   offered them -- what I told them is that I had a 100 percent

24   success rate, which was an embellishment on the truth because

25   they were varying results, but I did not offer anyone a cure.

1          THE COURT:  From what you're telling me, I'm not sure

2     that you stated an adequate factual basis for a plea of guilty

3     to this offense.

4          What's your position, Mr. Saltman?

5          MR. SALTMAN:  Well, I think he has, Your Honor.  He's

6     admitted again before Your Honor that his representation to

7     Mr. Stockton that he had --

8          THE COURT:  He said he didn't ever tell him that he had

9     100 percent cure rate, but instead that he had a 100 percent

10    success in treatment, which can get into a gray area.

11          MR. LILLEY:  I think that's what he said here today,

12    Judge.  What was accepted is the language in the plea.  We

13    agree it was sufficient to establish the plea that that was the

14    representation to Stockton which then induced --

15          THE COURT:  What else did you want to argue,

16    Mr. Lilley?

17          MR. LILLEY:  Judge, I don't have a whole lot further

18    other than just incarceration.  I don't want to go through

19    3553.  The court knows those and analyzes those in its head.

20          I would ask court to put him on an electronic monitor.

21    If the court feels incarceration is needed, a short period of

22    incarceration.  He's going to do what is needed.  That's it.

23          THE COURT:  Mr. Saltman?

24          MR. SALTMAN:  Your Honor, it is not often that I

25    personally ask the court to sentence a defendant at the high

1    end of the guideline range, but I'm going to ask the court to

2    do it today with regard to Mr. Haese.  I think a 33-month

3    sentence in this case is reasonable, Your Honor.  The court

4    knows the facts, and, you know, I've discussed already today

5    some of the more egregious conduct.

6             But I want to take issue with just a couple of things

7    that Mr. Lilley said.  Namely that, you know, that some of

8    these patients benefited from the treatment.  To what extent

9    anybody benefited from this treatment, I'm not aware, but what

10   I am aware of is that there are people that received this

11   treatment that experienced terrible side effects from it, and I

12   think that's because the defendant is not a licensed medical

13   doctor.  His father was, but when his father died, the

14   defendant decided to step into his shoes and conduct himself

15   like a doctor, like a licensed medical doctor who knew what he

16   was doing when he was prescribing drugs.

17            For instance, Your Honor, on page 42 of the sentencing

18   memorandum, it talks about Richard and Donna LaBrenze and their

19   experience from the treatment, and what it says is that -- and

20   this is what they told the case agent, that they both became

21   extremely sick from the treatment and considered going to the

22   hospital.  Ms. LaBrenze experienced severe vomiting, diarrhea

23   and was reduced to crawling to reach the hotel bathroom, and

24   she was bedridden for approximately 20 hours after receiving

25   one of the defendant's intravenous treatments.  They contacted

1    the defendant to seek further medical treatment, find out what

2    was going on.  In fact, Mr. LaBrenze contacted the defendant

3    and asked for his money back, and the defendant told him that

4    he had beaten the federal charges and that he was only charged

5    with mail fraud which was no big deal.

6         Some of the other victims, Your Honor, were told after

7    they received the treatment, "Call me in three months, tell me

8    if the treatment worked."  That's the sort of follow-up care

9    that these patients received.  And when they didn't get better

10   or they got worse, the defendant didn't do anything about it

11   because he couldn't do anything about it, because he wasn't who

12   he held himself out to be, which is somebody that had

13   personally treated 3,000 people with a 100 percent success

14   rate.

15        In fact, he was somebody that didn't develop this

16   treatment protocol at all, who had treated people with it, but

17   according to what he told agents at the time of the search

18   warrant on the Haese Clinic, less than 20.  He was not

19   experienced in administering the treatment.  He wasn't

20   experienced in follow-up care.  He didn't know what to do when

21   his victims suffered extreme side effects, and notwithstanding,

22   Your Honor, he continued to perform the treatment in excess of

23   $5,000 a pop.

24        We don't know where that money went, Your Honor.  But I

25   think the court can guess.  He's got a home that's valued at

1    least by the county assessor at over $500,000.  He's got or had

2    two H2 Hummers which are pretty expensive vehicles.

3              THE COURT:  Is there any equity in any of that?

4              MR. SALTMAN:  Not the Hummers, Your Honor, because he

5    traded them in for two, I believe, brand new Chevy Silverado

6    350 trucks.  He's got another vehicle.  $90,000 worth of

7    vehicles parked in a driveway somewhere.  He's got a $500,000

8    home he's walked away from, and --

9              THE COURT:  From what he said earlier, he couldn't sell

10   it for $500,000, he would sell it for considerably less than

11   $500,000.

12             MR. SALTMAN:  In this market, it's probably true.  He

13   probably couldn't sell it for $500,000.  But at one point,

14   his -- nobody's home around here is worth what it once was, but

15   at one point, this home was valued at $500,000.

16             He's got expensive vehicles in his driveway, and he

17   stands before you today and tells you that if you keep him out

18   of jail he'll make these victims whole.  Well, if he wanted to

19   make these victims whole, he could do it regardless of whether

20   the court sentenced him to prison or not.  He could take out a

21   loan on his mother's property, and he could pay back these

22   victims.

23             But what I'm hearing is that the defendant is trying to

24   buy his way out of jail right now.  He's telling the court

25   effectively, "If you keep me out of jail, I'm going to take out

1  a loan on my mother's property, and I'm going to make these

2  victims whole.  If you send me to jail, none of these victims

3  are going to get paid."

4         The defendant stands here today and apologizes for the

5  representations he made to Todd Stockton, but he doesn't say

6  anything about the other 21 victims that he defrauded of $5,000

7  in some cases, and 17,000 in other cases.  Instead, he asks the

8  court to sentence him to, I believe it was, a term of

9  probation, I may be wrong, and to allow him to pursue the

10 possibility of obtaining a loan on property that he doesn't own

11 to make these victims whole.

12        Clearly, Your Honor, the defendant in my estimation is

13 not remorseful for what he's done.  He's had a good time with

14 the money he's gained by virtue of his fraud and has no intent

15 to make the victims whole any time soon.  For those reasons,

16 Your Honor, I think a sentence of 33 months, which is the high

17 end in this case, is reasonable, and I would ask the court to

18 impose it.

19        THE COURT:  Let me ask probation, you had recommended a

20 33-month sentence at the bottom of the guideline range on the

21 prior range of 33 to 41 months.  The range now is 27 to 33

22 months.  What is your recommendation at this point?

23        MR. RODRIGUEZ:  Your Honor, the court has full

24 discretion.  Our recommendation would still be the bottom of

25 the guideline.

1          THE COURT:  Bottom of the guideline range?

2          Let me state for the record that in preparation for the

3     sentencing, I read the defendant's sentencing memorandum filed

4     November 2, 2011, document number 48; the United States'

5     response, document number 55, filed January 4, 2012; the United

6     States' supplemental response filed March 6, docket number 60;

7     a letter from Harry Wiley dated -- well, it is undated; a

8     letter dated March 21, 2012, from Ruben Sanchez; a letter dated

9     March 21, 2012, from Robert S. Loera; a letter undated from

10    Phil Elie; a letter dated March of 2012 from Kenny Wiley.

11         Are there any other written materials that I should

12    have considered?

13         MR. LILLEY:  Not that I'm aware of, Judge.

14         THE COURT:  Okay.  Let me state a proposed sentence and

15    you may comment on this.

16         I have reviewed the Presentence Report, and I have

17    considered the sentencing guideline applications and the

18    factors under 18 United States Code Section 3553(a).  It is the

19    judgment of the court as to Information 2010-130 that the

20    defendant, Carl Emanuel Haese, is committed to the custody of

21    the Bureau of Prisons to be imprisoned for a term of 27 months.

22         Let me ask if you request a recommendation of a

23    particular FCI?

24         MR. LILLEY:  Judge, he's got significant medical

25    problems, and so he's going to need to go to a medical

1    facility.

2            THE COURT:  What is the closest Federal Medical Center?

3    Is there still one in Fort Worth, or has that changed?

4            MS. GUTIERREZ:  I believe so, Your Honor.  Give me just

5    a minute.

6            THE COURT:  Yes, there is a medical center in Fort

7    Worth.

8            MR. LILLEY:  If that's the closest place, Judge.

9            MR. RODRIGUEZ:  Yes, Your Honor.

10           THE COURT:  I'll recommend that the defendant serve his

11   sentence in the Federal Medical Center Fort Worth, Texas, if he

12   is eligible.

13           The defendant is placed on supervised release for a

14   term of three years.  He must comply with the standard

15   conditions of supervised release and the mandatory conditions

16   that he not possess firearms, ammunition, explosive devices or

17   other dangerous weapons, and that he cooperate in the

18   collection of DNA as directed by statute.

19           The following special conditions are also imposed:

20           First, the defendant must submit to a search of his

21   person, property or automobile to be conducted in a reasonable

22   manner and at a reasonable time for the purpose of detecting

23   contraband, illegal narcotics, firearms and dangerous weapons.

24   He must inform others living with him that the premises are

25   subject to a search.

1          Second, the defendant is prohibited from incurring new

2    credit charges or opening additional lines of credit without

3    prior approval of the probation officer.

4          Third, the defendant must provide the probation officer

5    access to requested financial information, copies of his

6    personal income tax returns, an authorization for release of

7    credit information, and other business information in regard to

8    which defendant has an interest.

9          Fourth, the defendant must not have any direct or

10   indirect contact or communication with any of the victims or go

11   near or enter the premises where the victims are located except

12   under circumstances approved in advance in writing by the

13   probation officer.

14         In accordance with the Mandatory Victim Restitution

15   Act, it is further ordered that the defendant make restitution

16   to all of the victims listed in the judgment, and that combined

17   total is $164,522.53.  It does not include the claim of Karen

18   Lesinsky in the amount of $5,700.  If additional restitution is

19   requested, I will hold a hearing on restitution within 90 days

20   after the date of sentencing.

21         The defendant must pay one half of this amount, which

22   is $82,261.27 in a lump sum payment prior to commencement of

23   his sentence of imprisonment.  The remaining half will be paid

24   in monthly installments of $2,285.03 over a period of 36 months

25   during his term of supervised release.

1          Let me ask about the fine.  Was that agreed to in the

2  plea agreement?

3          MR. SALTMAN:  It was, Your Honor.

4          THE COURT:  In addition, the defendant must pay a fine

5  of $10,000.  That sum is to paid in monthly installments of

6  $277.77 during defendant's 36-month term of supervised release.

7  Collection of the fine will commence after the outstanding

8  restitution amount has been paid in full.

9          I will order that interest and penalties be waived on

10  both the restitution and the fine.

11          The defendant must pay a special assessment of $100,

12  which is due immediately.

13          I find that the defendant presently is neither a flight

14  risk nor a danger to the community; therefore, voluntary

15  surrender will be permitted.  The defendant must report to the

16  United States Marshals Service following this hearing and

17  arrange for self-surrender to the designated facility or the

18  the Marshals Service within 60 days from this date, or as

19  otherwise notified by the Marshals Service.

20          Under the terms of his plea agreement, Mr. Haese has

21  waived his right to appeal this proposed sentence.

22          Mr. Saltman, do you have any comments on that proposed

23  sentence?

24          MR. SALTMAN:  A few, Your Honor.  Just for point of

25  clarification, does the amount of restitution that this court

1    is ordering include prejudgment interest as required by the

2    Mandatory Victim Restitution Act?

3            THE COURT:  This is the first I've heard of prejudgment

4    interest.

5            MR. SALTMAN:  I believe, Your Honor, it is required

6    pursuant to the act.

7            THE COURT:  I confess that I've never read that

8    provision before, so I need some guidance from probation or

9    from the lawyers.

10           MR. LILLEY:  Judge, I haven't looked at that recently,

11   so I really can't argue against it or can't argue in agreement

12   of it.

13           THE COURT:  Well, where does it appear in the statute?

14           MR. SALTMAN:  3663, but I'll find that part of the

15   statute, Your Honor.  In fact, Your Honor, I apologize, I

16   thought I brought my code book, but I didn't.

17           THE COURT:  You're saying prejudgment interest is

18   mandatory?

19           MR. SALTMAN:  I believe so, Your Honor.  We looked at

20   that issue and actually --

21           THE COURT:  From what date or dates?

22           MR. SALTMAN:  I'm sorry, Your Honor?

23           THE COURT:  Is it from the date of entering the plea,

24   the date of each service or payment of services?  When do you

25   start calculating it?

1          MR. SALTMAN:  You know what, Your Honor, I'm not

2    entirely clear, and with the court's permission, I would like

3    to submit --

4          THE COURT:  Well, if it is not mandatory, I'm not going

5    to order it.  You've represented the statute requires me to

6    order it, I guess, but I'm not familiar with that provision.

7          MR. SALTMAN:  All right.  We'll try to find it here in

8    a minute, Your Honor.

9          THE COURT:  Okay.  Well, here you've got a multitude of

10   victims.  I have not the slightest idea how you would go about

11   calculating prejudgment interest if it is from the date that

12   they paid the amounts fraudulently, each of them separately, or

13   it is from the date he entered the plea of guilty or the date

14   of conviction or when it starts.

15         MR. SALTMAN:  I think I know when it ends, the date

16   that the judgment is issued, but, Your Honor, I don't know at

17   what point the court would begin to calculate the prejudgment

18   interest.  I can try to find that and provide that to the

19   court.  If not, if the government can't find it in answer to

20   that, the government won't ask for it.

21         THE COURT:  I know that I do have discretion to waive

22   postjudgment interest and penalties, and I just stated on the

23   record that I'm waiving that.

24         MR. SALTMAN:  Yes, Your Honor.  We're not seeking

25   postjudgment interest.

1              MR. LILLEY:  I agree with Mr. Saltman.  I don't know

2    enough about the situation or that interest to -- I would just

3    ask the court to -- I guess they would have leave to come back

4    to the court and submit something to determine exactly whether

5    it is mandatory, and if so, when does it start and how we would

6    go about calculating that.

7              THE COURT:  Do you have any information?

8              MR. RODRIGUEZ:  Your Honor, I do not.  The question is

9    whether or not this is mandatory.  I can honestly say that I

10   don't think I have ever submitted any prejudgment interest on

11   any case, and therefore, we're not familiar with whether or not

12   it is mandatory or not.  Certainly, the amounts that you have

13   before you do not include anything like that.

14             THE COURT:  Well, I'm simply not familiar with the

15   statute that requires imposition of prejudgment interest, so

16   I'll need to get guidance on this right away because we need to

17   enter a judgment soon.

18             MR. SALTMAN:  Yes, sir.

19             THE COURT:  Can you get --

20             MR. SALTMAN:  We'll try to have an answer for the court

21   before we leave the courtroom, Your Honor.

22             THE COURT:  I'll be here tomorrow, so you can tell me

23   tomorrow.

24             MR. SALTMAN:  All right.

25             THE COURT:  I'll be leaving before noon, I hope.

1    Judging from this hearing, I may be here until midnight

2    tomorrow night, too.

3            MR. LILLEY:  The government indicates that it is

4    mandatory, and I'm not -- I don't have the means to respond

5    right now whether I agree with them or don't agree with them.

6    I know it is a restitution issue, obviously.  So the court has

7    90 days to make a determination on -- I would advise to put it

8    off and the government -- it might be something I agree with.

9            THE COURT:  All right.  Well, I would like to avoid

10    filing a judgment and then having to file an amended judgment,

11    so --

12            MR. SALTMAN:  Your Honor, I believe the court's giving

13    the government 90 days anyway to try to obtain some sort of

14    verification of Karen Lesinsky's losses.

15            THE COURT:  Well, if you find a statute that says

16    prejudgment interest is mandatory, then what I'll need for you

17    to do is come up with a schedule of calculation of prejudgment

18    interest for each of the different victims.

19            MR. SALTMAN:  Okay, yes, sir.

20            Additionally, Your Honor, the government would ask that

21    the following language be included into the judgment:  That the

22    United States Probation Office, after the defendant completes

23    any term of supervised release the court imposes, the United

24    States Attorney's Office for the District of New Mexico may

25    revise the monthly payment amount depending on the defendant's

1  financial circumstances, and that no later than July 1st of

2  each year until restitution is paid in full the defendant shall

3  provide to the financial litigation unit of the United States

4  Attorney's Office in Albuquerque, New Mexico, a financial

5  statement and also a copy of the defendant's most recent tax

6  returns.

7         I understand that the court has ordered the defendant

8  to pay restitution in full by the time his supervised release

9  runs, but if that doesn't happen, we would ask the court,

10  especially ask the court to include that language from the

11  judgment.

12         THE COURT:  Why haven't you done it before right now?

13  Has probation heard anything about this?

14         MR. RODRIGUEZ:  No, Your Honor.

15         THE COURT:  Probation prepares the sentencing scripts.

16         MR. SALTMAN:  I understand, Your Honor.  I didn't have

17  this conversation with the probation officer, but in speaking

18  with the financial litigation unit, this is language that's

19  not -- that it hasn't been routinely requested in restitution

20  judgments, but it is something that the government is, I guess,

21  going to start asking for to be included in judgments.

22         THE COURT:  Let's do it this way.  Why don't you file a

23  motion asking that that language be included, and Mr. Lilley

24  can respond to it, and I'll make a decision later.

25         MR. SALTMAN:  Okay.

1          THE COURT:  Sounds like we're going to file an amended

2  judgment come hell or high water.

3          MR. SALTMAN:  I think that's all I have.

4          THE COURT:  Okay.  Anything else?

5          MR. SALTMAN:  Not from the government, no.

6          MR. LILLEY:  Judge, my only response to your proposed

7  sentence, obviously, I'm on record on my other objections, was

8  the payment of the $82,000 right away, I know that was in the

9  script, Judge, but we don't have $82,000 to pay.

10          THE COURT:  I didn't think you did, but that's part of

11  the order, so do the best you can.

12          MR. LILLEY:  Yes, sir.

13          THE COURT:  Is there any reason why the sentence as I

14  pronounced it should not be imposed at this time?

15          MR. SALTMAN:  No, Your Honor.

16          MR. LILLEY:  Judge, all my objections have been

17  previously noted.

18          THE COURT:  It is my order, then, that the sentence as

19  I stated it will be the sentence imposed in Number 2010-130.

20  We'll be in recess for about three minutes before we take up

21  the last matter.

22          MR. LILLEY:  I'll check downstairs.  If I can't locate

23  anybody from the Marshals Office downstairs, then I'll make

24  sure that we come back first thing in the morning.

25          THE COURT:  Meet with the marshals?

1          MR. LILLEY:  Yes, sir.  On the self-surrender.

2          THE COURT:  Thank you very much.  Court's in recess.

3          MR. SALTMAN:  Judge, I'm sorry.  There is one other

4   thing, Your Honor.

5          THE COURT:  Okay.

6          MR. SALTMAN:  Because the court is allowing the

7   defendant to voluntarily surrender, the defendant -- the

8   government is asking that the court modify his conditions of

9   release.

10          THE COURT:  I don't think he has any conditions of

11   release as best I can tell.

12          MR. SALTMAN:  No, Your Honor.  He was released OR, so

13   the government is asking the court at this time to impose

14   conditions of release, namely, that the defendant be prohibited

15   from incurring new credit card charges, opening additional

16   lines of credit, or negotiating or consummating any financial

17   contracts without prior approval of the probation office.

18          THE COURT:  Is there any objection to that, Mr. Lilley?

19          MR. LILLEY:  No, sir, we have no objection to that.

20          THE COURT:  That will be a condition of release, and we

21   need to advise him how to report to whom.

22          MR. LILLEY:  I will, Judge.  U.S. Marshals will give us

23   a notice of where and when we surrender.

24          THE COURT:  That's not what I'm talking about.  I'm

25   talking about conditions before he reports to serve his

1   sentence.

2           MR. LILLEY:  I thought the only condition was he just

3   didn't incur any -- if he does, to report it.

4           THE COURT:  He's got to report to a probation officer

5   to know who it is that he's talking to.

6           MR. LILLEY:  Okay.

7           THE COURT:  If he wants to open a line of credit, he's

8   got to go to that probation officer to get approval of it.

9           MR. LILLEY:  I'll find out from Mr. Rodriguez who we

10  need to report to.

11          MR. RODRIGUEZ:  We would ask for the record that

12  tomorrow he report to the pretrial office here on the first

13  floor, and they will be expecting him.  We will also ask that

14  being this is done in open court, if AUSA could file a motion

15  with those additional conditions with pretrial.

16          THE COURT:  Would you do that?

17          MR. SALTMAN:  Yes, sir.

18          THE COURT:  Okay.  We'll be in recess for three

19  minutes.

20      (Court recessed at 6:41 p.m.)

21

22

23

24

25

1                         C-E-R-T-I-F-I-C-A-T-E

2    UNITED STATES OF AMERICA

3    DISTRICT OF NEW MEXICO

4

5        I, John De La Rosa, RPR, CCR, Official Court Reporter for

6    the State of New Mexico, do hereby certify that the foregoing

7    pages constitute a true transcript of proceedings had before

8    the said Court held in the City of Albuquerque, New Mexico, in

9    the matter therein stated.

10       In testimony whereof, I have hereunto set my hand on this

11   6th day of April, 2015.

12

13

14

15

16                _____
                  JOHN DE LA ROSA, CCR
17                United States Official Court Reporter
                  421 Gold Avenue, Southwest
18                Albuquerque, New Mexico  87102
                  Phone:  505.348.2249
19

20

21

22

23

24

25